fabricated evidence to keep me under the jurisdiction of the Court.

n. Majority of above case\People, are just like myself, convicted in Kings County, because of the DA concealing evidence and failing to correct the Court about false\perjured evidence before it.

285.    It was Hynes's policy as well to tolerate (and thereby encourage) violations of his Office's constitutional obligation to make timely disclosure to the defense of exculpatory or impeachment information known as *Brady* material. His deliberate indifference to such violations created an "anything goes" atmosphere that caused such violations to continue, including in Plaintiff s case.

286.    In this regard, prosecutors and investigators were permitted and/or encouraged to refrain from making any record of false or inconsistent out-of-court statements of prospective prosecution witnesses in order to avoid creating *"Rosario* material" that would have to be disclosed to the defense under State law, even though this policy also resulted in prosecutors ultimately not disclosing the same information as *Brady* material. Indeed, under the Office's "riding" policy, prosecutors were permitted and even encouraged to make a record of statements that tended to inculpate a

suspect or defendant, while ignoring statements and expert evidence that are corroborated by independent evidence were inconsistent with their belief about the suspect' s or defendant's guilt.

287.    Hynes's prosecutors were permitted and/or encouraged to withhold recantation evidence, as well as statements and evidence, including 911 tapes, Medical Examiner evidence tending to prove a defendant's innocence, a complete defense unless they "believed" such evidence, thus depriving the defense and the Grand jury of vital information, required to be disclosed under *Brady,* that was necessary to evaluate witnesses' credibility and defendants' guilt or innocence.

288.    Prosecutors, in violation of *Brady,* were permitted and/or encouraged to refrain from disclosing material witness applications, orders, and proceedings, relocation assistance promised or provided to witnesses, and other pressure tactics, promises, or rewards used to influence witnesses.

289.    Prosecutors, in violation of *Brady,* were permitted and/or encouraged to stall or just not obey Court Orders to produce evidence, stalling the Court until they could claim spoliation of the evidence.

290.    Prosecutors were permitted and/or encouraged not to comply

102

with the Office's ongoing *Brady obligations* after trial, to resist defendants' efforts to obtain disclosure on appeal, during collateral attacks on convictions, or through FOIL requests, and to even lie to or mislead courts in affidavits and testimony, all in order to cover up the original misconduct and defeat defendants' efforts to expose misconduct and overturn wrongful convictions.

291.    While prosecutors were told in theory to comply with their *Brady* obligations, they were not told there would be any negative consequence to them if they failed to, and in fact there was none.

292.    Hynes had no employee handbook, manual, or other document setting forth any disciplinary process for such misconduct, or potential sanctions for them.

293.    Despite dozens of court decisions, many of which are listed in Ex. A, finding that prosecutors had wrongfully failed to disclose evidence actually or potentially favorable to the defense that should have been disclosed under *Brady, Rosario,* or statutorily-mandated discovery procedures, bad-faith destruction of evidence or otherwise had engaged in conduct that misled the court, Grand jury, and/or defense, none of the prosecutors involved were disciplined. They were not fired or suspended, fined, or demoted.

Notations were not placed in their personnel files. They were not

reported to outside disciplinary bodies. To the contrary, in opposing

defendants' efforts to overturn their convictions in such cases,

Hynes almost always defended the propriety of his assistants'

behavior, thereby ratifying it or at least signaling his tolerance of it -

just as he did in Plaintiff's case - and such personnel continued to

receive raises, bonuses, and promotions.

- Ex. A. contains cases either explicitly finding constitutional violations or finding violations under State law of *Rosario* or discovery violations that amounted to *Brady* violations, destruction of evidence in bad-faith. In the State law decisions, the appellate court did not need to reach the *Brady* issue, but the violations were constitutional in nature nonetheless.

- During depositions in *Zahrey v. City of New York, et al.*, 98 Civ. 4546 (OLP) (S.D.N.Y.), the former Chief of Investigations for Hynes, Dennis Hawkins, and Hynes's Counsel to the District Attorney, Dino Ameruso, acknowledged that there was no formal disciplinary procedures or policies and they were unaware of any ADA having ever been disciplined during Hynes's tenure for misconduct committed during the investigation or prosecution of criminal allegations. Further, the City Law Department acknowledged, with respect to a list of court decisions involving *Brady* and related violations, that no discipline had been imposed on any of the prosecutors. Hawkins admitted the Office had no written policy for disclosing *Brady* material. Hawkins and ADA Theresa Corrigan, who also gave a deposition, admitted that they were unaware of any specific training the Office provided on how to question or evaluate informant or accomplice witnesses. Finally, Hawkins testified that, despite having virtually daily contact with Hynes over many years, he

had not once ever heard him discuss the training of ADAs in such areas. Although the defendants in the *Zahrey* lawsuit did not admit liability, judgment was entered against Corrigan and Charles Guria, the chief of Hynes's Civil Rights Bureau who reports to VECCHIONE, individually (and against the City of New York and three former detective-sergeants), in 2009, for $750,001, plus counsel fees, pursuant to F. R. Civ. P. 68, to resolve Zahrey's lawsuit alleging malicious prosecution and manufacturing of false testimony during 1994-95, but Hynes's conducted no investigation and imposed no discipline on Guria or any other prosecutor for their conduct of the matter.

294.   A number of cases handled by Hynes's office during the time period of Plaintiff's prosecution evidence the above polices and patterns of misconduct by Hynes's staff and Hynes's approval or toleration of such behavior.

295.   Early in his tenure, Hynes communicated to his employees his views about witness coercion and abusing court process by vigorously defending his Office's murder conviction obtained in *People v. Russ,* 79 N.Y.2d 152 (1992). The case was built on the testimony of two teenage girls who, before trial, recanted their statements to police and to the grand jury. When one of the girls, Ms. Lawrence, testified that she had not seen the defendant commit the crime and then, in the midst of being challenged by the prosecutor, invoked her Fifth Amendment right against self-incrimination, the following astounding events occurred, according to

the New York Court of Appeals' opinion:

- [T]he prosecution interrupted Lawrence's midafternoon testimony and obtained a continuance. Lawrence, then 17 years old, was (1) arrested; (2) charged with perjury; (3) taken in handcuffs crying and frightened to the District Attorney's office; (4) interrogated and threatened with 2 to 7 years in prison; (5) removed to Central Booking for fingerprinting; (6) held until 5:00 A.M. the next morning without sleep; (7) moved to a precinct lockup; and (8) returned to court at 9:00 A.M. where she was kept in handcuffs except for her time on the stand. Lawrence's postarrest and postincarceration testimony, tending to inculpate defendant by describing his role in the mugging, resulted immediately in the perjury charges being dropped. She was only then released from police custody. (79 N.Y.2d at 177).

296.    In reversing the conviction, the Court condemned the "egregious" behavior of the BDAO in "'legally' coerc[ing] Lawrence's] testimony." *Id.* (citing *Rochin v. California*, 342 U.S. 165, 172 (1952) (conduct that "shocks the conscience"). That the jury heard what had occurred and could judge the witness's credibility was "not adequate," the Court's emphasized. "Experience has taught that such reliance offers only chilly comfort to prejudiced defendants, no less than to innocent victimized witnesses, and to maintenance of the integrity of the criminal justice process." *Id.*

297.    Shortly after the *Russ* decision, prosecutors under Hynes showed that they would take their lead from Hynes, not the Court of

106

Appeals. In *People v. Ruddy Quezada,* police detectives working with the BDAO secretly arrested the prosecution's principal witness, Sixto Salcedo, on a material witness order the BDAO had obtained. Instead of taking him to court, they kidnaped him, and held him with his wife incommunicado at the Marriott Hotel at LaGuardia Airport, where they threatened him with prison unless he conformed his trial testimony to his grand jury testimony. Neither the material witness order, the detention at the hotel, nor the other coercive threats to this witness was disclosed to the defendants, who were convicted.

298.    Years later, Salcedo recanted his trial testimony, and other witnesses emerged showing that the defendant, contrary to the People's case, had not committed the shooting. When Quezada, in 2003, moved in State court to vacate his conviction, the trial prosecutor, who was still in the office, ADA Ephraim Shaban, presented the sworn testimony of the detective, Thomas Buda, to deny that any material witness order had been obtained, that Salcedo had been arrested, or that he had been held at a hotel, and argued that Salcedo's "false" allegations of coercion undermined the credibility of his recantation. *See People v. Quezada,* 16 Misc.3d 1113(A) (Sup. Ct., Kings Co. 2007) (Gerges, J.). The People were successful. The court denied the

defendant's motion, leave to appeal was denied, and it appeared he

would never be able to challenge his conviction, since he already had

lost a federal habeas corpus petition and by law had the right to bring

just one.

299.    However, in a highly unusual decision, the United States

Court of Appeals directed that the Federal District Court permit

Quezada to pursue his second habeas petition. *See Quezada v. Smith,*

624 F.3d 514 (2d Cir. 2010).

300.    Just as in Plaintiff Collins's case, Quezada's

attorneys sought discovery, and the BDAO then had no choice

but to reveal the truth that it had been falsely denying, through

knowing reliance on perjury, for seven years: there *was* a material

witness application and warrant, and there *were* records showing

that Salcedo had been held at the Marriott Hotel at LaGuardia

Airport.

301.    Shortly after the trial in the *Quezada* case, the same judge

who had presided, Justice Abraham G. Gerges, denounced the practice

of the BDAO to misuse the court's subpoena process to coerce

witnesses. In a decision published July 7, 1994, Justice Gerges, in still

another murder case being prosecuted by VECCHIONE's bureau,

condemned a homicide ADA for serving a subpoena on a witness on a day there would be no testimony "in the hope that it would *coerce* the witness into consenting to be interviewed prior to testifying," found this to be "unprofessional conduct" under numerous prior court decisions outlawing the practice, and admonished the BDAO that the "practice should not be replicated." *People* v. *Neptune*, 161 Misc.2d 781, 785, 615 N.Y.S.2d 265, 267 (Sup. Ct., Kings Co. July 7, 1994) (emphasis added) (quoting *People* v. *Natal*, 75 N.Y.2d 379, 385 (1990)).

302.    Immediately thereafter, in another murder case prosecuted by Hynes's bureau, *People* v. *Brian Bond*, Ind. No. 13991/91, the assigned ADA defied Justice Gerges and the decisions of the Court of Appeals and the Appellate Division upon which his decision had been based. ADA Stan Irvin and detective-investigators working under his direction illegally subpoenaed all prospective witnesses to their Office to coerce them to submit to office interviews before testifying at the trial. Without disclosing to the court the impropriety of his subpoenas, Irvin then obtained material witness orders authorizing the arrest of any witness who failed to comply with the subpoenas.

303.    One witness, a crack addict named Carmen Green, had told police detectives and detective-investigators that she had not seen the incident in question at all. When BDAO detective-investigators found her, they noted that she was too "impaired" to comply with the subpoena. They knew as well that she was under investigation for, and feared, that she and her children would be arrested for dealing drugs out of her apartment. Obtaining a material witness warrant authorizing Green to be taken "forthwith" to court, where an attorney would be appointed for her, Irvin instead had her brought to his Office, where he and the detectives threatened her with incarceration and interrogated her on and off for eight hours. Only after she agreed to remain in their custody "voluntarily" did they finally bring her to court, after midnight, so that a judge could sign an order ratifying her "consent" to be detained until the conclusion of her testimony.

304.    The prosecutor, ADA Irvin, then violated the BDAO's *Brady* obligations by not disclosing to the defense Green's prior statements denying having seen the shooting, her eight-hour unlawful interrogation, her "impairment" on drugs, the threats to arrest her and her family, and promises to relocate her at public

110

expense. Nor did he disclose the statements of her other family members that she was not present during the shooting, or that they, too, had been promised, and did receive, relocation assistance. Bond was convicted, in December, 1994, of murder.

305. During an evidentiary hearing held in 1998 concerning Bond's subsequent motion to vacate his conviction due to *Brady* and related constitutional violations, an unapologetic ADA Irvin testified that it was the Office's *regular practice* to pick up witnesses on material witness warrants and, instead of bringing them directly to court "forthwith" as such warrants direct, to forcibly take them for interrogation to the D.A.'s Office.

306. In 2000, the New York Court of Appeals vacated Bond's conviction due to the Office's failure to disclose Green's statements denying having seen the homicide. The Office's Appeals Bureau had argued, on behalf of District Attorney Hynes, that it had no obligation to disclose statements that, in its view, were "untrue."

307. In August and September, 1994, during the BDAO's investigation of an NYPD detective, Zaher Zahrey, on corruption

allegations, detectives working under the supervision of ADA Charles Guria obtained court orders to produce a prospective witness, Sidney Quick, who was a crack addict and a career criminal, for interviews on the condition that his attorney would be present, but then, with Guria's approval, interrogated him without notifying his attorney.

308.    In March, 1995, after Quick had been sent upstate to serve his sentence, detectives, with Guria's approval, again met with Quick without his attorney, and, through a combination of coercion and excessive promises of speedy release, caused him to adopt a story they suggested to him, implicating the target of their investigation, which they knew from other evidence was false. They tape recorded this meeting and gave the tape to Guria, who listened to it, heard the coercion and improper promises, and heard the encouragement of Quick to adopt a false story. Remarkably, rather than condemn the detectives' tactics, he told them that Quick's statements were "promising."

309.    In or about January, 1996, detectives working directly under Guria's supervision arrested several other individuals in the hope of turning them into State's witnesses, took them to remote locations

112

instead of to court, and illegally interrogated them in violation of their right to counsel and to prompt  arraignment.

310.    Because none of Quick' s false story could be corroborated, which is a prerequisite for prosecution under New York, but not federal, law, Guria and his colleagues obtained Hynes's approval to recommend the case to federal authorities for prosecution. However, in doing so, they did not disclose the tape, the improper interrogation tactics used with Quick, or numerous of Quick's prior inconsistent statements. When Quick inadvertently disclosed to the federal prosecutor that he had been taped, Brooklyn ADAs delayed disclosing the tape for several weeks  to ensure that the federal authorities went ahead with the high-profile indictment and publicly committed themselves to the case. Zahrey ultimately was acquitted, but not until he had spent  nearly nine months in pretrial confinement. (Guria is presently  the chief of the BDAO's  Civil Rights Bureau  and reports to  VECCHIONE.)

311.    Also in 1994, Hynes ratified the misconduct of his Office in the Sarni Leka murder prosecution.  Leka was convicted, in March, 1990, early in Hynes's tenure as District Attorney, of murdering a relative on a Brooklyn street.  Shortly after the

113

conviction, Leka moved to vacate his conviction because the prosecution had actively suppressed from the defense its knowledge that an off-duty police officer's observation of the shooting from his apartment window was flatly inconsistent with the People's proof at trial, which consisted of the highly questionable identification testimony of two traumatized passersby, and had suppressed two other witnesses' potentially exculpatory statements. Not only did Hynes's office vigorously oppose the defendant's motion and appeal; *Hynes* wrote Leka's new defense counsel that he had *"personally* reviewed the facts and circumstances" of the case and "Mr. Leka's due process rights as a defendant were *amply and ably protected"* (emphasis added).  However, in 2001, the United States Court of Appeals vacated Leka's conviction, finding that the BDAO had actively

> "One of the prosecutors, ADA Theresa Corrigan, testified at a deposition that, pursuant to her training at the Office, she did not believe she was under any obligation to disclose to the defense prior inconsistent statements or "recantations" if she did not find such statements to be credible or true. This was the position that the Office took in the Brian Bond appeal. She also testified to her training not to make any record of witness statements to avoid disclosure under *Rosario."*

"suppressed" exculpatory evidence, decrying one of its arguments  as

114

"ridiculous," and concluding that the evidence the prosecution had suppressed would have had a "seismic impact" upon the results of the trial. *Leka* v. *Portuondo*, 257 F.3d 89 (2d Cir. 2001). With the only two identification witnesses having recanted their testimony, the BDAO was forced to dismiss the case and Leka, an apparently innocent man, was released after serving 12 years in prison.

> In 2008, the City of New York settled Leka's *Monell* lawsuit based upon the BDAO's *Brady* violations for $3.1 million

312.    Hynes has been on notice over the years, beginning before Plaintiff s trial, of credible allegations of overzealousness and misconduct directed specifically at VECCHIONE, but has consistently encouraged misconduct by VECCHIONE, just as he has encouraged the rest of his staff, by his indifference to such allegations.

313.    In February, 1995, which was prior to Plaintiff s trial, defendant Frank Rodriguez, who had been convicted at trial in October 1993 *(People v. Rodriguez,* Ind. No. 9893/92), documented in his appellate brief that VECCHIONE had blatantly violated numerous fundamental rules of trial behavior. The brief showed that VECCHIONE repeatedly and sarcastically asked the defendant on cross-examination whether the other witnesses in the case were lying -despite numerous appellate decisions decrying such a tactic. In summation, the brief

showed,  VECCHIONE had improperly ridiculed the defense as "laughable,"

improperly argued that the defendant wanted the jury to believe only he was telling

the truth while all the People's witnesses were lying, and impermissibly vouched for

the People's witnesses as not "the type" of people who would lie.

    314.  In early 1995, also before Plaintiff s trial, Hynes's office

opposed the motions of defense lawyers in *People v. Steven Ruiz, et al.*, Ind. No.

12848/94, which exposed VECCHIONE's improper practice of using "office"

subpoenas to compel witnesses, including the defendant, to appear at his Office

for interviews without counsel. Supreme Court Justice Robert Kreindler found

that the Homicide Bureau (led by VECCHIONE) had utilized such "office"

subpoenas "unethically and abused court process," and that they had "improperly

denied [the defendant's] request for an adjournment of the subpoena in order to

obtain counsel." VECCHIONE's conduct was particularly egregious because it

came after Justice Gerges's decision directing the BDAO to no longer misuse

subpoenas in this fashion.

    315.    But that was not all of VECCHIONE's misconduct  in

*Ruiz*. Defense motions  showed that a key prosecution witness, Ashan Iqbal, did

not identify the defendant Pennachio or recall a crucial alleged incident during an

interview with police.  Only after three meetings,  totalling nearly 10 hours, with

VECCHIONE, MAHER, and BONDOR at VECCHIONE's  office,  did Iqbel,

under VECCHIONE's relentless pressure, finally change his account and

implicate the defendant in wrongdoing.  In order to avoid disclosure to the defense, VECCHIONE, MAHER, and BONDOR took no notes of these interviews, and VECCHIONE did not disclose Iqbel's statements under *Brady*. The witness's oral statements favorable to the defense under *Brady* were not disclosed until a pretrial identification or *Wade* hearing, when MAHER was compelled to reveal them under questioning.    Because no one had taken notes, MAHER's recollection was vague about the specifics of what lqbel had said.

316.    Still another witness, Ricardo Urichima, made a statement to police supporting the defendant's self-defense defense, but, despite his *Brady* obligations, VECCHIONE and his subordinates did not disclose it for a full year, until jury selection, when the witness no longer was Available to the defense. (The practice in VECCHIONE's bureau of delaying disclosure of *Brady* material until the defense could no longer make use of it was condemned by the Federal Court of Appeals in its decision in the *Leka* case.)

317.  VECCHIONE's misconduct reached new heights (and was eerily similar to his misconduct in Plaintiff's case), and was fully exposed to Hynes, in the Office's triple murder prosecution of Jeffrey Marshall. During the first trial in March, 1993, VECCHIONE represented, and had his key rebuttal witness, Cicero Murphy, testify, that Murphy was a "volunteer" witness, that

VECCHIONE had made no promises to Murphy, and that Murphy expected no benefit in return for his testimony. Murphy testified that he had only weapon possession and assault cases open, and that there was no relationship between these open cases and his testimony. Marshall was convicted of robbery and received a sentence of 12 ½ to 25 years in prison.

318.    VECCHIONE's homicide bureau then brought Marshall to trial in two additional murder cases. The ADA whom VECCHIONE assigned to handle these two cases, and who was working under his supervision, did not disclose any cooperation agreement between the Office and Murphy, and Murphy testified in 1994 that there wasn't any. (In both cases, Marshall was acquitted.)

319.    Shortly thereafter, the Nassau County District Attorney's Office prosecuted Marshall in an attempted murder case, and wrote the BDAO to find out whether the Office had any cooperation agreement with Murphy. VECCHIONE personally responded, by letter dated January 17, 1995, *unequivocally denying* that his Office had any such agreement. Despite Murphy's testimony, Marshall was acquitted.

320.  Following Marshall's robbery conviction, on January 12, 1996, Marshall, represented by new counsel, moved, pursuant to Criminal Procedure Law § 440.10, to vacate his conviction. New counsel's investigation had revealed that VECCHIONE, after the first trial, had written to the State Division of Parole on

118

Murphy's behalf to assist Murphy in obtaining an early release, and four days later had *personally* entered into a *formal written cooperation agreement* with Murphy to testify in the next two cases. The agreement allowed Murphy to receive a mere two-year sentence in satisfaction not only of his gun charge but also of his *pending first degree rape* charge, for which he faced up to 25 years in prison – a charge that VECCHIONE had not disclosed to the defense at Marshall's first trial.

321.   Murphy's motion also included VECCHIONE's letter to the Nassau County D.A. *denying* the existence of the formal written cooperation agreement that *VECCHIONE himself* had signed.

322.   To defeat Marshall's motion, VECCHIONE then signed a sworn affirmation (also eerily similar to the false affirmation he executed to oppose Plaintiff s 440 motion), containing the following false assertions of "fact": that VECCHIONE had never discussed any benefit with Murphy before his initial testimony; that VECCHIONE did not even know at the first trial that Murphy was facing a rape charge; that VECCHIONE did not know that his subordinate had not disclosed the written cooperation agreement before the second and third trials, and that VECCHIONE somehow had misunderstood the Nassau County D.A.'s inquiry when VECCHIONE represented that "There are no agreements between this Office and Cicero Murphy..." Based upon VECCHIONE's affirmation (as

in Plaintiff s case), a state judge denied the defendant's 440 motion without a hearing.

323.  Hynes then rewarded  VECCHIONE  with a promotion  to First Deputy District

Attorney.

324.  But a completely unforeseen and unlikely development  led to the further exposure of VECCHIONE's misconduct. In 2002, Brooklyn Federal District Judge Edward R. Korman granted an exceedingly rare federal habeas corpus hearing into the Marshall case, and  VECCHIONE  was forced to respond to questioning,  under  oath, about his conduct.

325.  During cross-examination, VECCHIONE admitted that his affirmation claiming that, at the time he prosecuted Marshall, he had not known about Murphy's pending rape charge, was false. He further admitted that, while he had represented to the court during that trial in his sworn application for an "order to produce" that he would contact Murphy's attorney so that he could protect Murphy's rights, he had not done so. Meanwhile, Murphy's attorney's testimony showed that, before Murphy testified, the attorney, *with Murphy's knowledge,* had been trying to negotiate a lenient misdemeanor  deal for his client with VECCHIONE,  and that VECCHIONE  had circumvented the attorney by secretly obtaining the order to produce Murphy at his office without notifying the  attorney.

326.    To avoid adverse findings of fact by Judge Korman about VECCHIONE's dishonesty and lack of credibility and his commission of *Brady* violations, *District Attorney Hynes,* in February 2003, authorized the Office to reduce Marshall's 25-year sentence to time served, and Marshall went free after serving a fraction of his sentence despite being, in the Office's view, a multi-murderer.

327.    Neither VECCHIONE, nor any other ADA, was disciplined in any respect for the misconduct -remarkably similar to Plaintiff s case -that occurred in the Marshall case.

328.    To the contrary, immediately after this startling and deeply troubling resolution of the Jeffrey Marshall case, Hynes placed VECCHIONE, assisted by ADAs Monique Ferrell and Kevin Richardson, in charge of the highly-publicized and important investigations of Brooklyn Democratic leader Clarence Norman and of alleged judicial corruption in Kings County. Hynes reportedly referred to VECCHIONE as his "go-to" guy on corruption and his "architect and quarterback" in this highly-publicized investigation, and promoted VECCHIONE to be the Office's Chief of Investigations.   He did so despite his awareness of still other troubling  allegations  about VECCHIONE's uncontrolled  overzealousness.

329.    In *People v. Smith,* 267 A.D.2d 483 (2d Dept. 1999), the

Appellate Division found that VECCHIONE's summation in a murder case "may have been excessive and improper," but declined to reverse the conviction because of its view that the defendant would have been convicted anyway. In that case, a robbery that led to the fatal shooting of a police officer, VECCHIONE flagrantly violated established rules restricting a prosecutor's rhetoric in summation. He called the defendant's testimony a "fairy tale," suggested that his attorney had helped him fabricate his testimony, intimidated the jury by telling it that if it gave any credit to the defendant's testimony it would be making "a mockery of this system," ignored the court's sustaining of an objection to this comment and improperly reiterated it, and tried to inflame the jury's emotions by reading the "Police Officer's Prayer" to "the Lord" and urging the jury to convict so that "Ray Cannon's [the officer's] rest with the Lord [may] be long and peaceful."

330.    In March 2000, Judge Alan Marrus dismissed an indictment of a businessman, Sam Lustigmann, in an obstruction of justice case, because VECCHIONE had caused a grand jury to indict him despite having given him immunity from prosecution in exchange for his cooperation during an office interview. While VECCHIONE claimed that his agreement with Lustigmann was voided by the latter's withholding of material information, the court rejected this defense because of VECCHIONE's failure to record or take any

notes during the interview.

331. In *People v. Rodriguez*, 28 A.D.3d 496 (2d Dept. 2006), the highly-publicized murder case involving social worker Amy Watkins, VECCHIONE, during the trial in July 2001, repeatedly denigrated defense counsel for trying to fool the jury, castigated the defendant as a "calculated coward" who (despite the absence of such evidence) had probably committed other robberies, and tried to inflame the passions of the jury by defying the court's rulings sustaining objections to his blatant appeals for sympathy for the victim and her family. The court found VECCHIONE's tactics to be "improper," but upheld the verdict due to the overwhelming evidence of guilt.

332. On May 3rd, 1995, Plaintiff filed his petition in Federal Court for a writ of habeas corpus, contending that the Office was continuing to cover up *Brady* violations, denial of access to exculpatory material; court minutes, and other illegal behavior, and that the Office had a continuing obligation to disclose evidence of such misconduct. Knowing the substance of Plaintiff s claims and the considerable extent to which they were documented, Hynes, rather than conduct any independent investigation, again assigned Amy Appelbaum to represent the Office. With Hynes's knowledge and approval ,Amy Appelbaum, again denying all of Plaintiff s

allegations under oath, misrepresenting the alleged victim testimony, so the fact that Theo testified who Amy said was a undisclosed identified witness, that Camile lied and said Theo came and saved her from me and Theo told the Police and DA this was a lie before my arrest and he testified to the same in Court, and Applebaum lied to the Court about Camiles testimont in the grand jury and in trial because Camille stated that we fought and at no time did she surrender, and the DA's own Medical Examiner told them Camille was lying, there was no rape. After a complete examination he found no bruising, laceration anywhere even around the vaginal area. So Applebaum changed Camille's testimony and left out the fact she told everyone that we were fighting even upon penetration. This is a Material lie that Amy Applebaum swore an oath to be true that she knew was not true, thus again sought to have the petition denied without a hearing and all 440's post-convictions were denied based upon the defendants knowingly withholding and materially misrepresenting the facts to the Court..

333.  After Federal Judge Sifton directed a hearings, specifically evidentiary and compel, that I would be allowed the opportunity to present my evidence I filed with the Court on the record, the defendants devised plan that did the following:

-  Defendants never brought me to Court for any scheduled hearing and

I was under their Care, Custody and Control.

- Defendants then had others and\or another in the Court create 2 different Pacer profiles. The 1st the 1 only I see and when I would call the Court would be told no updates until I was told denials.

- The other Pacer profile was the real court profile that showed all updates and scheduled hearings. I did not find out about this until last year when I went into the clerk in the Eastern District and he told me after reviewing my papers what was going on.

- Defendants then had others and\or another make all motions mines and defendants become lost and told this to the Court of Appeals. Nothing was lost, and if the papers really were, I was to be contacted to ask if I had copies to replace the evidence. I just updated the Court of Appeals on this evidence as I filed these "lost" documents last week, 4/26/2016 16-571-pr Court of Appeals 2nd

- Upon reading the Motion the Defendants deliberately committed fraud upon the Court, materially changed factual testimony, misrepresented testimony in a materially way to the court. All my evidence proved this and would free me. This is why the defendants had others and\or another in the Eastern District Court make everything disappear. Never let me know about the scheduled

125

hearings or brought me to the hearings. I go into this more in

paragraph 293.

334. The foregoing violations of Plaintiff's federal constitutional

rights and resultant injuries were directly, foreseeably, proximately, and

substantially caused by conduct, chargeable to Defendant City of New

York, amounting to deliberate indifference to the constitutional rights of

persons, including Plaintiff, subject to prosecution by the BDAO, namely:

- the institution and implementation of plainly
  inadequate or unlawful policies, procedures,
  regulations, practices and/or customs concerning:

- the duty not to use false, misleading or unreliable
  evidence, testimony, statements or argument during
  criminal proceedings, including bail hearings, pretrial
  hearings, and trial;

- the continuing obligation to correct false, inaccurate,
  incomplete or misleading evidence, testimony, statements
  and argument, whenever such misconduct is discovered to
  have occurred, including moving or consenting to overturn
  convictions discovered to have been obtained through such
  unconstitutional means;

- the continuing duty to obtain, to preserve, and to make
  timely disclosure to the appropriate parties, including the
  court and the defense, during criminal investigations and
  prosecutions, of all material evidence or information
  favorable to a person suspected, accused or convicted of
  criminal conduct, including exculpatory evidence as well as
  evidence impeaching the credibility or undercutting the
  reliability of prosecution witnesses, and including verbal as
  well as recorded information; and

- the duty to refrain from abusing court process or otherwise coercing or manufacturing false or inherently unreliable statements and testimony from witnesses;

- the failure to adequately instruct, train, supervise, and discipline their employees with respect to such matters.

335.  The aforesaid deliberate or *defacto* policies, procedures, regulations, practices

and/or customs (including the failure to properly instruct, train, supervise

and/or discipline employees with regard thereto) were implemented or

tolerated by policymaking officials for the Defendant City, including, but

not limited to, the District Attorney of Kings County and his delegates, who

knew:

a)  to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b)  that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

c)  that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

336. The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances:

a) as noted above, numerous credible allegations, many substantiated by judicial decisions, that police officers and ADAs, including had wrongfully withheld, lost, or destroyed evidence favorable to the defense that the prosecution had been required to timely disclose to the defense under *Brady,* had presented or failed to correct false or misleading testimony and argument, and/or had abused judicial process to coerce false or inherently unreliable statements or testimony from witnesses;

b) civil lawsuits, some of which resulted in substantial civil settlements, alleging that police and/or ADAs had falsified, exaggerated, or withheld evidence, thereby wrongfully injuring individuals suspected or accused of cnme;

c) numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of New York City or Brooklyn prosecutors to comply with that rule;

d) judicial decisions putting the Kings County District Attorney on notice that the City could be held liable for its failure to adequately train, supervise, or discipline ADAs regarding their *Brady* and related due process obligations, including their obligations not to abuse judicial process or coerce false or unreliable statements and testimony, *see, e.g., Walker* v. *City of New York,* 974 F.2d 293 (2d Cir. 1992); *Ramos* v. *City of New York,* 285 A.D.2d 284,

729 N.Y.S.2d 678, 692-96 (15[1] Dept. 2001), *Leka* v. *City of New York*, 04 CV 8784 (DAB), and *Zahrey* v. *City of New York, et al.*, 98 Civ. 4546 (DCP);

e)    the inherent obviousness of the need to train, supervise and discipline ADAs in their aforementioned constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

337. Despite this knowledge, the supervisory and policymaking officers and officials of the Defendant City perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, regulations, practices and/or customs, did not effectively instruct, train and/or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, had no employee handbook or other published practices, policies or procedures for investigating and disciplining prosecutors who had engaged in *Brady* violations and related constitutional violations, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead sanctioned or tolerated the policies, procedures, regulations, practices and/or customs, described above, with deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the City and the State of New York.

338. The aforesaid policies, procedures, regulations, practices and/or customs of Defendant CITY were collectively and individually a substantial factor in bringing about the aforesaid violations of Plaintiff's rights under the Constitution and Laws of the United States and in causing his damages.

339. Under the principles of municipal liability for federal civil rights violations, the District Attorney of Kings County (or his authorized delegates) has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," not to abuse judicial process, to make timely disclosure of exculpatory evidence or *Brady* material to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial, trial, and post-trial proceedings.

340. The Kings County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and

discipline, with respect to his Office's performance of its duties.

341. The District Attorney of Kings County at all relevant times was and is an elected officer of Kings County, one of the constituent counties of Defendant CITY, and the Office was and is funded out of the CITY's budget.

342. Furthermore, the District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); and New York has provided by statute (N.Y. County Law §§ 53, 941) that the CITY's constituent counties (including Kings County), and hence Defendant CITY itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

343. The District Attorney of Kings County, Charles J. Hynes, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

344. During all times material to this Complaint, the CITY, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their subordinates

violating the aforementioned constitutional rights of criminal  suspects or

defendants and of other members  of the  public.

345.  By virtue of the foregoing, Defendant CITY is liable for

having substantially caused the  foregoing violations  of Plaintiff's

constitutional  rights and his resultant   injuries.

## TENTH CAUSE OF ACTION

### (Negligent Hiring, Training and Supervision Under State Law; Defendant City of New York)

346.  Plaintiff repeats and realleges each and every allegation contained

in paragraphs 1 through 345 of this  Complaint.

**347.**  By virtue of the foregoing, defendant  City of New  York  is liable

to plaintiff  because of its intentional, deliberately indifferent, careless,

reckless, and/or negligent failure to adequately hire, train, supervise, and

discipline its agents, servants and/or employees employed by  the BDAO

and.or the NYPD  with regard  to their aforementioned   duties

## ELEVENTH CAUSE OF ACTION

(Rivera\Grubbs\STATE CREATED DANGER VIOLATION OF SUBSTANSIVE 5TH AND 8TH AMENDMENTS\ all defendants, named and unnamed known and Unknown)

348.          Plaintiff repeats and realleges each and every allegation

contained in ,paragraph 1 through 347 of this  Complaint.

349.          For decades the defendants past and present have witheld

Brady evidence and other truth finding information only for it ti miraculously turn-up after the person has been incarcerated for decades. New York knows this has happened numerous times and had this evidence been made available to the Court and or Defense it is a high likelihood that the rulings made by the Judge and\or Jury would have been in defense favor. The State actors known about this issue for decades and had ample opportunity to reflect on this problem and still a system such as Pacer that you can see the evidence that was files does not exist. This was encouraged conduct as none has been punished, loss their jobs, put in jail. Yet because of their conduct, I personally have lost 30 yrs and counting of my liberties, others have lost more, their lives, all of us lost some sort of mental stability. Destroyed families, etc.

350.       Even after all of this the State Court of NY has yet to impement a system like Pacer where evidence is filed online where it can be downloaded. So all evidence can now be traced and downloaded by the defense;

351.       No more rulings that state "He claims Brady material that was suppressed but he never filed this Brady evidence or made it available to the Court"

352.       No more Prosecution claiming they searched thru the record but found no evidence that is referenced by the defendants

353.       No more missing records, missing evidence or claims this

133

was never filed with the Court

354.        There is no rational bases that these things have been happening for decades and the State Courts have not implemented a Federal Pacer like system to keep track of the evidence, filed with the motions incase things turn up missing.

## COUNT XII

## PENDENT CLAIM OF GROSS NEGLIGENCE AND NEGLIGENCE

355.        Paragraphs 1 - 354 are incorporated by reference as fully set forth.

356.        Defendants the have been grossly negligent and negligent in the supervision, training, and monitoring of their representatives who consult with and counsel police officers and District Attorneys who are suspected of crimes and misconduct, and police officers and district attorneys who are witnesses to crimes and misconduct by their fellow officers.

357.        By virtue of the unique public safety considerations implicated by police violence, its pivotal role in the official investigation of police misconduct, and its express undertakings in its collective bargaining agreement with the City, the PBA and the individual PBA as well as BDAO defendants have a duty to make sure their members and their agents, who are also police officers, do not violate-their duties as police officers and

officers of the court, BDAO to report crimes and misconduct by fellow

officers.

358.    The PBA and the individual PBA defendants have been grossly negligent    and

negligent in the instruction and training they provide to their members with

respect to their responsibilities to report crimes or misconduct by other police

officers.

359.    The PBA and the individual PBA defendants have been on notice for many years

that their representatives have played a role in the improper obstruction of

criminal investigations of New York City police officers.

360.    The PBA and the individual PBA defendants knew or should

have known that their policies and practices have contributed to improper

concealment of admissions by police officers to PBA representatives, and a

"code of silence" being followed by police officers, who are also PBA members,

to cover up crimes and misconduct.

361.    The PBA and the individual PBA defendants knew or should

have known that their policies and practices, as well as their grossly negligent

and negligent supervision and training of PBA representatives, created an

atmosphere where the most violent police officers felt assured that their most brazen acts of misconduct would not be swiftly and effectively investigated and prosecuted.

362.        The mistreatment Mr. George previously set forth, and the subsequent cover up of those events, were reasonably foreseeable results of the PBA's and the individual PBA defendants' negligent conduct.

## COUNT XIII

## PENDANT CLAIMS OF FALSE ARREST AND FALSE IMPRISONMENT

363.        Paragraphs 1- 362 are incorporated by reference as though fully set forth.

364.        Patrick George was ""wrongfully, unlawfully, and unjustifiably charged, arrested, detained and deprived of his liberty against his will, and was imprisoned by defendants

365.        At all relevant times, these defendants acted forcibly in apprehending Mr. George. The wrongful, unjustifiable, and unlawful apprehension, arrest, detention and imprisonment was carried out without a valid warrant.

366.        After his arrest, Mr. George was wrongfully harassed, threatened,   and subjected to the taking of mug shots in a particularly humiliating fashion and fingerprinting.

367.        Throughout Mr. George's false arrest and imprisonment,

defendants did not permit him an opportunity to establish his innocence.

368.    At all times mentioned, the unlawful, wrongful, and false arrest and imprisonment of Mr. George was without right or probable cause, and was forcible and against his will.

369.    All of the foregoing occurred without any fault or provocation on the part of Mr. George.

370.    At all relevant times defendants other unknown John Doe police officers and unknown Amy Appelbaum supervisors who were responsible for the false arrest and imprisonment of Mr. George were employees of the NYPD and the City, and were acting for, upon and in furtherance of the business of their employers and within the scope of their employment.

371. As a result of the false arrest and imprisonment, Mr. George was subjected to humiliation. ridicule, and disgrace. He was required to incur bills for legal services rendered, and was otherwise injured and damaged.

## COUNT XIIII

## PENDENT CLAIMS OF INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

372.   Paragraphs 1- 371 are incorporated by reference as though fully set forth.

373.   One objective of this extreme and outrageous course of conduct was to inflict   severe mental and emotional distress upon Mr. George so as to intimidate, terrify, and dissuade him from exposing the vicious mental assault and torture inflicted upon him, the false arrest and imprisonment, and the unconscionable delay and denial of justice.

374.   Defendants would offer me sufficient jail time knowing that I did not do the crimes I was charged with and they had along the evidence the proved I was illegally charged. More over they knew I knew they had the evidence but would all work together to see to it I would never get the chance to put it on the record thus denying me the right to obtain a higher Judicial review as the law is generally what is not on the record cannot be brought to the Higher Court for it to hear as a matter of 1st impression.

375.   The aforesaid acts of intentional, reckless and negligent infliction of emotional and mental distress by defendants constitute misconduct of an egregious nature that exceeds all bounds usually tolerated by a civilized society.

## COUNT XV

PENDENT CLAIM OF PRIMA FACIE TORT

376.    Paragraphs 1- 375 are incorporated by reference as though fully set forth.

377.    By their actions, as set forth above, all defendants inflicted harm upon Mr. George, without excuse or justification, out of disinterested malevolence.

COUNT XVI

PENDENT CLAIMS OF MAKING AN INJURIOUS
FALSE OR FRAUDULENT STATEMENTS

378.  Paragraphs 1- 377 are incorporated by reference as though fully set forth.

379.    Defendants had an obligation to accurately and

reliably report information that would be relevant to Mr.

George's arrest and what charges to bring.

380.   Nevertheless, Defendants neglect to state in Indict 4166\87 that

all evidence contradicts everything they were told by Camille and

that in the case of 11047/90 the evidence contradicted all claims

that I was a shooter, ID as a shooter or matched the description of

a shooter.

381.   The knowingly false information provided by Defendants and at

other times before, during after the Court proceedings including

the Grand Jury traumatized Mr. George by delaying and

depriving him of Justice and by causing him fear, pain and

anguish.

## COUNT XVII

PENDENT CLAIMS OF GROSS NEGLIGENCE AND NEGLIGENCE
AND INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL
DISTRESS

382. Paragraphs 1- 381 are incorporated by reference as though fully set forth.

383. Defendants, were grossly negligent and negligent in that they had a duty to

disclose, not suppress or destroy after a Court order to preserve for Mr. George

which they violated by delaying, suppressing and allowing to be destroyed

material exculpatory and truth finding evidence, and by providing knowingly

false information to the Court thus justifying the Courts continuing hold. An

ordinarily reasonable and prudent person would have acted within the scope of

their employment duties and would have updated the Court to this material

exculpatory evidence and not allow the suppression of it as by duty under Brady

but also moral , wanting to get to the truth attitude so they would not have

allowed the destruction of the evidence, Court minutes.

384. Defendants knew or should have known that their denial of exculpatory

evidence would created an unreasonable risk of bodily harm  and Mental

harm and did cause Mr. George  mental distress and anguish.

## COUNT XVIII

## PENDENT CLAIM - RESPONDEAT SUPERIOR

385.  Paragraphs  1- 384 are incorporated  by reference  as though  fully  set forth.

386.  At all relevant times, all defendant employees of the City of New York were

acting for, upon, and in furtherance of the business of their employer and within

the scope of their   employment.

387.  Consequently, the City  is liable under the doctrine of *respondeat  superior*  for
their tortious  actions.

## **EQUITABLE TOLLING**

In a situation where fraud or concealment of the existence of a claim prevents an
individual from timely filing, equitable tolling of a statute of limitations is permitted until
the fraud or concealment is, or should have been, discovered by a reasonable person in
the situation.

We recognize that there may be rare cases in which no channel of review was actually
available to a defendant with respect to a prior conviction, due to no fault of his own. The
circumstances of this case do not require us to determine whether a defendant could use a
motion under § 2255 to challenge a federal sentence based on such a conviction.[2] Cf.,
e. g., 28 U. S. C. § 2255 (1994 ed., Supp. V) (allowing a second or successive § 2255
motion if there is "newly discovered evidence that, if proven and viewed in light of the
evidence as a whole, would be sufficient to establish by clear and convincing evidence
that no reasonable fact finder would have found the movant guilty of the offense"); ibid.
(tolling 1-year limitation period while movant is prevented from making a § 2255 motion
by an "impediment . . . created by governmental action in violation of the Constitution or
laws of the United States").Daniels v. United States, 532 US 374 at 383-384 - Supreme
Court 2001

 The Third Circuit has found equitable tolling appropriate where fraud consisted "of false
representations of material fact with knowledge of their falsity and with intent to

deceive" and the representation was believed and acted upon by the party deceived to his disadvantage.Borges v. Gonzales, 402 F.3d 398, 407 (3d Cir. 2005),Neves, 613 F.3d at 36; Mezo, 615 F.3d at 621; Rashid, 533 F.3d at 132

388.    Since 1989 I have repeatedly tried to access the Courts to prove my claims under the law.

## BRADY VIOLATIONS

389.    Facts are similar to my case

- 22-year-old Darryl "Black" Rush – released for DA concealing evidence\Prosecutor Misconduct

- Jabbar Collins – released for DA concealing evidence\Prosecutor Misconduct

- John Flemings-– released for DA concealing evidence\Prosecutor Misconduct

- Michael Waite  – released for DA concealing evidence\Prosecutor Misconduct

- David McCallum – released for DA concealing evidence\Prosecutor Misconduct

390.   All of the above case\People, are Black just like myself, all convicted in Kings County because of the DA concealing evidence and failing to correct the Court about evidence or the circumstances surrounding the evidence brought before the Court. The FBI head Director the new DA Kenneth Thompson for Brooklyn, all state the Police\DA are not properly trained in protecting  people rights are under the law and need to be re-trained.

# EXHIBITS SIMULAR VIOLATIONS

# ONGOING MANUFACTORING OF GRAND JURY

## INDICTMENTS

An Innocent and Fraudulently Convicted Man's 39 Year Battle Against

Devastating Injustice by the Kings County District Attorneys' Office

Alfred Mancuso, 111 ½ Roselawn Avenue, Fairport, NY 14450, 585-490-

0299

To Whom It May Concern:

Quest For Even-Handed Justice Since The Year Of 1976, In The Interest

Conflicted Kings County Criminal Justice System.

On November 8, 1976, former Kinds County District Attorney Eugene Gold,

fraudulently filed forged Indictment No. 3414/76 against Alfred Mancuso, and on

that same date filed forged Indictment No. 3415/76 against Ronald Spagna and

Dominic Vaccarino for the same murder pertaining to forged Indictment No.

3414/76 against Mancuso. (These two forged indictments were thereafter

consolidated for trial purposes.)

Earlier during its term, the presiding #1 October 1976 Grand Jury voted

upon and issued genuine Indictment No. 3097/76 against Mancuso and

three other defendants, in which they all were charged with "Conspiracy In

The Second Degree". This indictment, which was dismissed as to

Mancuso, provides a valid signature by the foreman of the presiding Grand

Jury in regard to forged Indictment Nos. 3414/76 and 3415/76. Thus, Mancuso has, in his possession, a genuine specimen of the Grand Jury foreman's signature for comparison purposes with the forged foreman's signatures on Indictment Nos. 3414/76 and 3415/76. Certified copies of all three indictments as of January, 2014 have been furnished to Kings County District Attorney Kenneth P. Thompson, have been ignored by him. Even only a cursory comparison of the Grand Jury foreman's genuine signature contained on Indictment No. 3097/76 with the purported Grand Jury foreman's signature on Indictment Nos. 3414/76 and 3415/76 establishes quite convincingly that the signatures on Indictment Nos. 3414/76 and 3415/76 are forgeries. Moreover, surely the records which were compiled by the presiding Grand Jury are issue-determining as far as the indictment forgery is concerned, yet no member of the Kings County District Attorney's staff, including current District Attorney Kenneth P. Thompson, will reveal where they are located. (County Law Section 700(6)(7) and the Judiciary Law mandates that the District Attorney maintain and permanently retain records which are compiled by Grand Juries.)

Yet Kings County Supreme Court Justice Matthew J. D'Emic has falsely summarily ruled that the issue-determining Grand Jury Records do not exist.

September 12, 2015

Honorable Kenneth P. Thompson, District Attorney, Kings County, 350 Jay Street, Brooklyn, NY 11201

Re:    People v. Mancuso

        Wrongful Cover-up of Forged Indictment Nos. 3414/76 and 3415/76 Since The Year Of 1976

Dear District Attorney Thompson:

Since January 1, 2014, when you took office and I believed that you were a genuine proponent of equal and even-handed justice, I have strenuously sought your attention in regard to the pervasive wrongdoing that I have suffered through since 1976 by the District Attorney's office. You have been disposed only to ignore my repeated letters of protest and thereby condone the indictment forgery involved in the prosecution of my above-referenced criminal case. Moreover, you have also allowed Hynes-era prosecutors operating in your Appeals Bureau to continue their wrongful cover-up of the forgery of Ind. Nos. 3414/76 and 3415/76, when all you need to do to remedy the egregious injustice is review the tell-tale records which are contained in your files.

Recently I learned about the wrongdoing by members of your Appeals Bureau in regard to the prosecution and conviction of defendant Rudy Quasada, whom was imprisoned since the year of 1993. Assistant District

Attorney Marie-Claude Wrenn and here supervisor Assistant District
Attorney Jane Meyers, according to news media accounts of his court
ordered release from imprisonment, by virtue of their lie-making concealed
documentary evidence contained in your files which are and were crucial
to his legal proceedings. I see these recent exposures of wrongdoing by
your Appeals Bureau as proof that your office harbors callous miscreant
masquerading as ethical public servants.

Contained in my August 18, 2015 letter to Assistant District Attorney
Caroline R. Donhauser, which I provided you with previously and
resubmit another copy of herewith, are the easily verifiable facts
concerning her crimes against me. Moreover, as did former disgraced
District Attorney Charles J. Hynes, you have not processed my Criminal
Complaint dated October 14, 2013 in regard to the crimes committed
against me by Donhauser, Hynes and other members of your office staff,
which I have mailed directly to you for inquiry and investigation. What
you have apparently done is sidetrack this formal Criminal Complaint in
the total absence of any inquiry!

In any event, I hereby make clear, once again, that the signatures contained
upon Ind. Nos. 3414/76 and 3415/76 purported to be those of my presiding
#1 October 1976 Grand Jury Foreman are forgeries, and that the Grand
Jury records in your possession conclusively reveal that said presiding

146

Grand Jury ended its term on October 27, 1976 without having voted upon

forged Ind. Nos. 3414/76 and 3415/76.

Finally, it is my firm belief that your failure to investigate my fact-based protests,

is wrongful in and of itself.

September 10, 2015

A Tale Of Un-remediated Injustice Since The Year Of 1976, Which

Resulted In 33 Years Of Wrongful Imprisonment For Alfred Mancuso. An

Injustice Which Current Kings County Supreme Court Administrative

Judge Matthew J. D'Emic, Is In The Process Of Covering-Up.

Criminal Procedure Law Section 190.20(3) dictates that: "After a

Grand Jury has been impaneled, the Court must appoint one of the Grand

Jurors as Foreman and another to act as Foreman during any absence or

disability of the Foreman. At some time before commencement of their

duties, the Grand Jurors must appoint one of their number as Secretary to

keep records material to the conduct of the Grand Jury's Business."

Criminal Procedure Law Section 190.05 clearly provides that: "A Grand Jury is a

body consisting of not less than sixteen nor more than twenty-three persons,

impaneled by a Superior Court and constituting a part of such Court."

Under Criminal Procedure Law Section 190.15, a Grand Jury's term may

be extended by the Court only "upon declaration of both the Grand Jury

and the District Attorney that such Grand Jury has not yet completed or

will be unable to complete certain business before it."

Under Criminal Procedure Law Section 190.25(1) any: "affirmative official action or decision (by a Grand Jury) requires the concurrence of at least twelve members thereof."

Under Criminal Procedure Law Section 190.25(4)(a) Grand Jury proceedings are secret, but may be accessed by Court order.

Former Kings County District Attorney Charles J. Hynes, during Federal Civil Rights Proceedings, initiated against him by Alfred Mancuso during the year of 2007 (See Mancuso v. Hynes 07CV3455(TCP)(ARL), U.S. District Court, E.D.N.Y.), repeatedly admitted that all of the records which were compiled by Mancuso's presiding #1 October 1976 Grand Jury existed under his custody and control, which included those records compiled by the Secretary to said presiding Grand Jury.

During the year of 2014 and prior to any action taken by Kings County Supreme Court Administrative Judge Matthew J. D'Emic, Alfred Mancuso furnished him by mail with all of former Kings County District Attorney Charles J. Hynes; written admissions in the Federal Court that the records which were compiled by Mancuso's presiding Grand Jury existed but were sealed by New York Law.

However, Supreme Court Justice D'Emic began his cover-up of the Indictment forgery performed by his friend and mentor, former Assistant

District Attorney Ronald J. Aiello, by virtue of his July 14, 2014 letter to Mancuso. In this letter to Mancuso, D'Emic, while ignoring Hynes' repeated admissions during 2008, 2009 and 2010 in Federal Civil Rights proceedings that Mancuso's Grand Jury records existed but were sealed by New York State Law, and without making any effort to inquire of the current District Attorney whether these issue-determining Grand Jury records existed. He relied upon a November 5, 2001 earlier decision by Justice Anne G. Feldman issued long before D.A. Hynes' 2008 through 2010 repeated admissions in Federal Court that the Grand Jury records exist, and summarily ruled that said Grand Jury records don't exist. Moreover, Justice Matthew J. D'Emic, by virtue of his Order dated December 4, 2014, in responding to Attorney David M. Palmiere's submission to him that the signatures on Indictment Nos. 3414/76 and 3415/76 purported to be those of the Foreman to the presiding #1 October 1976 Grand Jury are forgeries, ruled that the original ink copies of said signatures would be made available for inspection by Mancuso and his handwriting expert. However, both Justice D'Emic and the Clerk of Court under his direction as Administrative Judge, have completely ignored Mancuso's repeated written requests to them for a scheduled access to the original ink copies of Ind. Nos. 3414/76 and 3415/76. Additionally, Justice D'Emic's interest conflicted relationship with one of the named indictment

forgerers, former A.D.A. Ronald J. Aiello, has caused Justice D'Emic to

cover-up the existing records pertaining to the aforesaid indictment

forgery.

Since even-handed justice does not prevail for Mancuso in Justice

D'Emic's interest conflicted court, Mancuso continues to show the horrible

wrong that Justice D'Emic has done to him via the internet.

Please read about the horrors Mancuso has suffered since the year of 1976,

at the hands of Brooklyn Criminal Justice authorities. It is factually

chronicled below.

## DAMAGES  DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants
as follows:

    a.    For compensatory damages of not less than $50 million;

    b.    For punitive damages against the individual Defendants to
be determined by a jury;

    c.    For pre-judgment  interest as allowed by law;  and

    d.    For such other and further relief as this Court may deem
just and proper.

I Patrick George declare under all penalties of perjury that everything contained herein is
true and known to me by my own 1st hand, direct knowledge.

Dated: JUNE, 10th 2017

Patrick George, Pro $\text{5c}$
1426 E 98th Street
Brooklyn, NY 11236
718 593 1070

## EXHIBIT A

11-2610-cv Newton v. City of New York 1 1 UNITED STATES COURT OF APPEALS 2 FOR THE SECOND CIRCUIT 3 4 5 August Term, 2012 6    7 (Argued: October 3, 2012    Decided: February 26, 2015) 8 9 Docket No. 11-2610-cv 10 11

12 13 ALAN NEWTON, 14 15 Plaintiff-Appellant, 16 17 v. 18 19 CITY OF NEW YORK, 20 Defendant-Appellee. * 21 22 23 24 25 Before:    26 27 LYNCH, LOHIER, and DRONEY, Circuit Judges. 28 *

The Clerk of Court is respectfully directed to amend the official caption to conform with the above. 2 1 Appeal from a judgment of the United States District Court for the 2 Southern District of New York granting the defendants' motion to set aside a jury 3 verdict for plaintiff Alan Newton, who spent over twenty years in prison for rape, 4 robbery, and assault before he was exonerated by DNA evidence.    The jury 5 found that the City of New York had denied Newton his constitutional rights to 6 due process and access to the courts when it failed to produce the rape kit that 7 eventually exonerated him.    In granting the post-verdict motion, the District 8 Court relied on our decision in McKithen v. Brown, 626 F.3d 143 (2d Cir. 2010).    9 We conclude that (1) McKithen does not foreclose Newton's due process claim; 10 (2) Section 440.10(1)(g) of the New York Criminal Procedure Law, which permits 11 a court to vacate a conviction based on newly discovered evidence, gave Newton 12 a liberty interest in demonstrating his innocence with new evidence; and 13 (3) substantial evidence supported the jury's finding that the City acted with 14 recklessness or deliberate indifference toward Newton's constitutional rights.    15 VACATED and REMANDED with instructions to reinstate the jury verdict with 16 respect to Newton's Fourteenth Amendment claim and to reconsider Newton's 17 First Amendment claim in light of this opinion. 18 19 JOHN FRANCIS SCHUTTY, III, Law Office of 20 John F. Schutty, P.C., New York, NY; David 21 T. Goldberg, Donahue & Goldberg, LLP, 22 New York, NY; Eric J. Hecker, Cuti Hecker 23 Wang LLP, New York, NY, for 24 Plaintiff-Appellant. 25 26 DRAKE A. COLLEY, Edward F.X. Hart, 27 Arthur G. Larkin, for Michael A. Cardozo, 28 Corporation Counsel for the City of New 29 York, New York, NY, for 30 Defendant-Appellee.    31 32 James W. Quinn, Karin S. Portlock, Devin 33

151

M. Cain, Weil, Gotshal & Manges LLP, New 34 York, NY; Keith A. Findley, Innocence 35 Network, University of Wisconsin Law 3 1 School, Madison, WI, for amicus curiae The 2 Innocence Network. 3 4 Andrew H. Schapiro, Molly A. Karlin, 5 Quinn Emanuel Urquhart & Sullivan, LLP, 6 New York, NY, for amici curiae 7 Evidence-Management Professionals Bruce 8 Adams, Kolene Dean, Ron K. Peterson, John 9 San Agustin, John Vasquez. 10 11 LOHIER, Circuit Judge: 12 Nearly thirty years ago, Alan Newton was wrongly convicted of a crime he 13 didn't commit.    He served over twenty years in prison.    Had he been given 14 access to exonerating DNA evidence that the City of New York long misplaced 15 and mishandled, Newton very likely would have been a free man years earlier.    16 Newton and his attorneys procured his freedom, and a New York State court 17 vacated his conviction, only after countless efforts to access that evidence finally 18 came to fruition in 2006.    Once freed, Newton sued the City and various officials 19 in the New York City Police Department ("NYPD"), claiming that the City's 20 evidence management system was inadequate and had deprived him of his rights 21 to due process and access to the courts in violation of the Fourteenth and First 22 Amendments, respectively.    Newton prevailed in a federal jury trial in the 23 United States District Court for the Southern District of New York on these 24 constitutional claims against the City, but the District Court set aside the verdict 25 based on our decision in McKithen v. Brown, 626 F.3d 143 (2d Cir. 2010). 4 1 We consider two primary issues on appeal.    First, does New York law 2 provide a convicted prisoner a liberty interest in demonstrating his innocence 3 with newly available DNA evidence?    Second, if so, does the Due Process Clause 4 of the Fourteenth Amendment entitle such a prisoner to reasonable procedures 5 that permit him to vindicate that liberty interest?    McKithen answers neither of 6 these questions; District Attorney's Office for the Third Judicial District v. 7 Osborne, 557 U.S. 52 (2009), requires that we answer both in the affirmative.    We 8 therefore vacate and remand with instructions to reinstate the jury verdict with 9 respect to Newton's Fourteenth Amendment claim and to reconsider Newton's 10 First Amendment claim in light of this opinion. 11 BACKGROUND 12 A. Alan Newton's Conviction 13 On June 23, 1984, a woman, V.J., was assaulted, raped, and robbed after 14 leaving a convenience store in the Bronx.    V.J. lost her left eye and suffered four 15 broken ribs.    She described her attacker to a police detective as a black male who 16 identified himself as "Willie," approximately five feet, nine inches tall, from 17 twenty-five to twenty-seven years old, with a moustache and short, neat afro.    18 The NYPD collected a rape kit from V.J. that contained pubic and head hair, three 19 cotton swabs, and four microscope slides.    Based on photo arrays and later an 20 in-person line-up, V.J. identified Newton as her assailant.    A store clerk, too, 21 identified Newton from a photo array and a line-up.    5 1 In May 1985 a Bronx County jury convicted Newton of rape, robbery, and 2 assault based on eyewitness testimony, including the store clerk's and V.J.'s 3 identification of Newton as her attacker.    Newton was sentenced to concurrent 4 prison terms of eight and one-third to twenty-five years for each of the rape and 5 robbery charges and a consecutive term of five to fifteen years for the

assault.   The rape kit was not tested for DNA evidence prior to Newton's trial.1 6 7 B. Attempts to Obtain DNA Testing and Exoneration 8 In 1988 Newton moved for an order authorizing an expert to inspect the 9 rape kit and conduct forensic tests to permit him to move to set aside his verdict pursuant to New York Criminal Procedure Law Section 440.10.2 10 1 At the time, only limited serological testing was available. 2 At all relevant times, Section 440.10 provided as follows: At any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that . . . [n]ew evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence . . . . N.Y. Crim. Proc. Law § 440.10(1)(g) (McKinney 2012); N.Y. Crim. Proc. Law § 440.10(1)(g) (McKinney 1970). 6 1 The New York State Supreme Court granted Newton's motion and ordered the 2 Bronx County District Attorney to arrange to deliver the DNA sample to the 3 City's Office of the Chief Medical Examiner, where Newton's expert could 4 supervise testing.   The District Attorney's Office retrieved the rape kit from the 5 NYPD's Property Clerk Division ("PCD") and delivered it to the Office of the 6 Chief Medical Examiner, which reported that the sample contained no testable 7 spermatozoa.   8 Six years later, in 1994, the New York State legislature enacted New York 9 Criminal Procedure Law Section 440.30(1-a), which permits a defendant to seek 10 testing of DNA evidence in order to vacate his conviction as follows: 11 [W]here the defendant's motion requests the performance of a 12 forensic DNA test on specified evidence, and upon the court's 13 determination that any evidence containing deoxyribonucleic 14 acid ("DNA") was secured in connection with the trial resulting 15 in the judgment, the court shall grant the application for forensic 16 DNA testing of such evidence upon its determination that if a 17 DNA test had been conducted on such evidence, and if the results 18 had been admitted in the trial resulting in the judgment, there 19 exists a reasonable probability that the verdict would have been 20 more favorable to the defendant. 21 N.Y. Crim. Proc. Law § 440.30(1-a) (McKinney 1994).   Shortly after Section 22 440.30(1-a) was enacted, Newton filed a pro se motion in State court seeking DNA 23 testing of the rape kit on the ground that technological advances since 1988 had 24 enabled scientists to test samples they had previously deemed untestable. In 25 opposing the motion, the District Attorney's Office responded that its extensive 7 1 investigation had revealed that the physical evidence was never returned after the 2 1988 analysis and that the rape kit could not be found at the District Attorney's 3 Office, the PCD, or the Office of the Chief Medical Examiner.   The State court 4 denied Newton's motion.   5 In 1995 Newton filed a habeas corpus petition under 28 U.S.C. § 2254 in the 6 Southern District of New York.   In the course of the habeas proceeding, and in 7 response to Newton's request in that proceeding that the City produce the rape

8 kit for testing, the City informed Newton and the court that the kit "could not . . . 9 be located." Joint App'x 3316. Other than V.J.'s clothes, which the City was 10 able to find as part of its response to Newton's petition, little else appears to have 11 come of Newton's habeas proceeding. And so, in 1998, Newton again sought 12 DNA testing of the rape kit and other physical evidence from State court. Citing 13 conversations with the PCD, the District Attorney's Office reaffirmed that the 14 rape kit could not be located and opposed the motion. As part of the 15 government's opposition, an NYPD Sergeant explained that the voucher 16 describing the location of the rape kit was not in its last listed location and that the 17 kit "must have been destroyed." Joint App'x 2779. The Sergeant elaborated 18 that the voucher was probably destroyed, either because a 1995 fire at the 19 Property Clerk's Office had destroyed several files or because the Property 20 Clerk's Office had a practice of destroying inactive records after six years. 21 Although the State court granted Newton's motion insofar as he sought DNA 8 1 testing of V.J.'s clothes, which the police had found, it denied his motion as to the 2 rape kit. 3 In 2005 Newton, through counsel, asked an Assistant District Attorney 4 ("ADA") who was then Chief of the Sex Crimes Bureau of the Bronx County 5 District Attorney's Office and who had previously not been directly responsible 6 for handling Newton's case whether the PCD would search once more for the 7 rape kit. Attaching a copy of the voucher that had previously been reported lost, the ADA asked Inspector Jack Trabitz at the PCD to retrieve the rape kit.3 8 Based 9 on the barrel number for the rape kit that appeared on the voucher, the PCD was 10 able to find the rape kit in a barrel located in the PCD's Pearson Place Warehouse 11 in Queens. 12 In June 2006 the Office of the Chief Medical Examiner concluded that the 13 DNA profile derived from the rape kit did not match Newton's DNA profile. 14 Within a month, Newton and the District Attorney's Office jointly moved to 15 vacate his conviction. The next day, the New York State Supreme Court vacated 16 Newton's conviction pursuant to New York Criminal Procedure Law Section 17 440.10(1)(g). By this time, Newton had been incarcerated for more than twenty 18 years. He had been seeking the evidence for the renewed testing that exonerated 19 him – and had been repeatedly told that it no longer existed and could not be 20 found – for over a decade. 3 It is unclear how the ADA obtained this

of the voucher. 9 1 C. Newton's Lawsuit 2 Newton was immediately released from prison and filed his lawsuit a year 3 later. His complaint asserted twenty-one causes of action against the City and 4 individual defendants. As relevant to this appeal, Newton alleged that the City's 5 evidence management system "deprive[d] [him] of important and well 6 established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth 7 Amendments to the United States Constitution," as well as his right to access to 8 the courts under the First Amendment. In October 2009 the District Court

9 dismissed his constitutional claims against the individual defendants so that only 10 common law claims remained against some of them.    11 Relying on Osborne, however, the District Court allowed Newton to continue his claim against the City for violating his due process rights.4 12    In 13 Osborne, the Supreme Court ruled that an Alaska statute that permitted a 14 prisoner to challenge his conviction when newly discovered evidence requires 15 vacatur of the conviction gave the plaintiff "a liberty interest in demonstrating his 16 innocence with new evidence."    557 U.S. at 68.    The District Court concluded that Section 440.30(1-a)(a) of New York's Criminal Procedure Law5 17 conferred on 4 The District Court also separately refused to dismiss Newton's First Amendment claim. 5 Section 440.30(1-a)(a) was not enacted until 2004.    The District Court's mistaken reference to subsection (1-a)(a) – rather than to subsection (1-a), which was in effect at the time that Newton filed his pro se motion in State court seeking DNA testing of the rape kit – is understandable and of no moment because the relevant language in both versions of the statute is the same.    Compare N.Y. Crim. Proc. 10 1 Newton a similar "liberty interest in vacating his conviction by accessing 2 evidence in the state's possession for the purpose of DNA testing."    Newton v. 3 City of New York, 681 F. Supp. 2d 473, 489 (S.D.N.Y. 2010).    The court also 4 determined that Newton had raised a triable question as to whether New York's 5 procedures were inadequate to vindicate his rights: "Newton has tested New York's procedures and has shown them to fail."6 6    Id. at 490.    7 Before trial, discovery in the case uncovered the original voucher for the 8 rape kit, which in turn revealed that the PCD had received a photocopy of an 9 "out-to-court" log from the City's Corporation Counsel in 2009 indicating that the 10 rape kit had last been removed in 1988.    The photocopy had prompted the PCD 11 to review the file of out-to-court vouchers for 1988 and led to the discovery of the 12 original voucher in that file.    Law § 440.30(1-a)(a) (McKinney 2004), with N.Y. Crim. Proc. Law § 440.30(1-a) (McKinney 1994). 6 The District Court initially determined that Newton stated a claim against the City for failure to train or supervise.    The defendants then moved for reconsideration in light of Young v. County of Fulton, 160 F.3d 899, 904 (2d Cir. 1998), which held that a plaintiff could not sustain a municipal liability claim under a failure to train theory when the city's employees had violated a right that was not clearly established at the time.    In a January 2010 order, the District Court acknowledged that it was bound by our decision in Young and instead relied on Tenenbaum v. Williams, 193 F.3d 581, 595-97 (2d Cir. 1999), in which we allowed a plaintiff to pursue a claim against a municipality for an unlawful city policy when the rights at issue were not clearly established at the time of the violation.    Newton was then permitted to proceed on the theory that the City maintained an unlawful policy, custom, or practice.    11 1 After a three-week trial, a jury found that the City had denied Newton his 2 First Amendment right of access to the courts and his Fourteenth Amendment 3 right to due process of law, had "engaged in a pattern, custom or practice of 4 mishandling evidence" and "acted with an intent to deprive . . . Newton of his 5 constitutional rights or with a reckless disregard of those rights," and had proximately caused Newton's

protracted incarceration.7 6    The jury awarded 7 Newton $18 million in compensatory damages against the City.    8 The defendants moved to set aside the verdict pursuant to Rule 50 of the 9 Federal Rules of Civil Procedure, arguing that our decision in McKithen v. Brown, 10 issued after the verdict, foreclosed relief. In granting that motion, the District 11 Court relied on McKithen, Osborne, and New York Criminal Procedure Law 12 Section 440.30(1-a)(b).    Based on McKithen and Osborne, it determined that 13 Newton did not have "a right to receive the DNA evidence," but merely "a right 14 to the process under the New York statute."    Newton v. City of New York, 784 F. 15 Supp. 2d 470, 479 (S.D.N.Y. 2011) (emphases omitted).    It also interpreted Section 16 440.30(1-a)(b) as (1) authorizing a State court, faced with a motion to vacate, to 17 order the police to disclose the last known physical location of evidence, but (2) 7 The jury also found Inspector Jack Trabitz, the then-head of the PCD, and Sergeant Patrick McGuire, a PCD intake supervisor, liable for intentional infliction of emotional distress ("IIED").    The District Court later overturned the entirety of the jury's verdict, including its IIED finding.    Newton v. City of New York, 784 F. Supp. 2d 470, 483-85 (S.D.N.Y. 2011).    Newton does not appeal the District Court's decision on his IIED claims.    Therefore, we consider only Newton's First Amendment access-to-courts and Fourteenth Amendment due process claims against the City. 12 1 preventing the same court from drawing an unfavorable inference from the fact 2 that the evidence has been lost.    Id. at 478.    The District Court observed that 3 prior to the enactment of Section 440.30(1-a)(b) in 2004 the City was not obligated 4 to disclose the location of evidence and that, in any event, Section 440.30(1-a)(b) 5 contemplated the possibility of lost evidence.    Id. at 479-80.    For these reasons, 6 the District Court held that Newton was entitled to no more than the last known 7 location of the evidence.    8 The District Court also held that Newton's constitutional due process claim 9 failed because there was not enough evidence that City officials had acted with a 10 culpable state of mind.    Id. at 480-81.    It concluded that although Newton had 11 demonstrated that the City's evidence management system was deficient, he had 12 failed to prove that a specific person had acted with anything more than 13 negligence.    In addition, relying on the failure of his underlying Fourteenth 14 Amendment claim, the District Court granted the City's motion to set aside the 15 verdict as to Newton's First Amendment claim.    16 Newton appealed.    17 DISCUSSION 18 "We review de novo a district court's decision to grant a Rule 50 motion for 19 judgment as a matter of law, applying the same standard as the district court."    20 Cash v. Cnty. of Erie, 654 F.3d 324, 332-33 (2d Cir. 2011) (citations omitted).    A 21 court may grant a Rule 50 motion only if "a party has been fully heard on an issue 22 during a jury trial and the court finds that a reasonable jury would not have a 13 1 legally sufficient evidentiary basis to find for the party on that issue."    Fed. R. 2 Civ. P. 50(a)(1).    Although a party making a Rule 50 motion always faces a heavy 3 burden, "[t]hat burden is particularly heavy where, as here, the jury has 4 deliberated in the case and actually returned its verdict in favor of the 5 non-movant."    Cash, 654

156

F.3d at 333 (quotation marks omitted).    6 A. Fourteenth Amendment Due Process Claim 7 We review Newton's Fourteenth Amendment Due Process claim 8 "according to the familiar two-part test for analyzing alleged deprivations of 9 procedural due process rights: (1) whether [Newton] has a cognizable liberty or 10 property interest under state or federal law . . .; and (2) if so, whether [Newton] 11 was afforded the process he was due under the Constitution." McKithen, 626 12 F.3d at 151.   13    1. Newton's Liberty Interest 14 To determine whether New York law conferred on Newton a liberty 15 interest in demonstrating his innocence with newly discovered evidence, we start 16 with Osborne.    17 William Osborne was convicted by an Alaska jury of kidnapping, assault, 18 and sexual assault and sentenced to twenty-six years in prison.    557 U.S. at 58.    19 In a federal post-conviction proceeding, Osborne sued State officials under 42 20 U.S.C. § 1983, claiming the Due Process Clause gave him a constitutional right to 21 access DNA evidence in the case for testing by an advanced method not available 22 at the time of his trial.    Id. at 60.    The Ninth Circuit held that Alaska was 14 1 required to disclose the DNA evidence to Osborne as part of its Brady obligations, 2 which extended to certain potentially viable post-conviction claims of actual 3 innocence.    Osborne v. Dist. Att'y's Office for the Third Judicial Dist., 521 F.3d 4 1118, 1128-32 (9th Cir. 2008), rev'd, 557 U.S. 52 (2009).    Without identifying the 5 precise standard Osborne needed to satisfy in order to prevail on his 6 access-to-evidence claim, the Ninth Circuit determined that Osborne had 7 demonstrated more than a reasonable probability that he would not have been 8 convicted had the DNA evidence been disclosed to the defense at trial.    Id. at 9 1133-34. 10 The Supreme Court reversed on the ground that there was no freestanding 11 substantive due process right to DNA evidence.    557 U.S. at 72.    Citing the 12 progress of individual States in passing DNA-testing statutes, the Court 13 expressed its reluctance to expand the scope of substantive due process or to 14 embroil federal courts in questions of State-based policy – for example, questions 15 such as "how long" a State must "preserve forensic evidence that might later be 16 tested," or whether a State would be obligated to collect evidence before trial.    Id. 17 at 73-74.    18 Despite its reservations about expanding the scope of the substantive due 19 process right, the Court located a liberty interest grounded in a general 20 post-conviction relief statute enacted by the Alaska legislature that made 15 1 evidence from DNA testing available to defendants.    Id. at 68.    That statute 2 provided: 3 A person who has been convicted of, or sentenced for, a crime may 4 institute a proceeding for post-conviction relief if the person 5 claims . . . . (4) that there exists evidence of material facts, not 6 previously presented and heard by the court, that requires 7 vacation of the conviction or sentence in the interest of justice . . . .    8 Alaska Stat. § 12.72.010 (2008).    A related provision stated, in relevant part: 9 (b) . . . a court may hear a claim [brought under Alaska Stat. 10 § 12.72.010] . . . . (2) based on newly discovered evidence if the 11 applicant establishes due diligence in presenting the claim and 12 sets out facts supported by evidence that is admissible and . . . (D) 13 [that] establishes by clear and convincing evidence that the 14 applicant

is innocent. 15 Alaska Stat. § 12.72.020 (2008).   Based on these Alaska statutory provisions, the 16 Court concluded that "Osborne does . . . have a liberty interest in demonstrating 17 his innocence with new evidence under state law," 557 U.S. at 68, and that 18 "Alaska provides a substantive right to be released on a sufficiently compelling 19 showing of new evidence that establishes innocence," id. at 70.   20 The City does not genuinely dispute that New York law conferred on 21 Newton "a liberty interest in demonstrating his innocence with new evidence."   22 McKithen, 626 F.3d at 152.   Newton retains such an interest even without the 23 City's concession.   For the purpose of determining whether a liberty interest 24 exists in this case, we think the New York statute that Newton invokes is 25 materially indistinguishable from the Alaska statute upon which Osborne relied.   16 Specifically, at the time Newton filed suit, Section 440.10(1)(g) 1 8 of the New York 2 Criminal Procedure Law provided that a court "may, upon motion of the 3 defendant, vacate" a conviction on the ground that "[n]ew evidence has been 4 discovered" that would probably have led to an outcome at trial more favorable to the defendant. 5 9   N.Y. Crim. Proc. Law § 440.10(g) (McKinney 1970).   6 Moreover, the State's explicit statement on the importance of DNA testing – 7 reflected in its enactment of Section 440.30(1-a) in 1994 – only strengthens the case 8 for State recognition of a liberty interest.   9   2. What Process Was Due 10 We turn next to determine what process was due to vindicate Newton's 11 State-created liberty interest in demonstrating his innocence with new evidence, 12 mindful of Osborne's related pronouncement that "[t]his 'state-created right can, 8 Section 440.10(1)(g-1) now permits a judge to vacate a sentence in light of "[f]orensic DNA testing of evidence."   This section, which gives a movant a more specific liberty interest in proving his innocence with DNA testing, was not enacted until 2012, long after Newton's conviction was vacated.   See 2012 N.Y. Sess. Laws 294 (McKinney).   Newton therefore cannot rely on the current version of the statute.   Under Osborne, however, the broader language of subsection (1)(g) covers newly available DNA evidence and gives Newton a liberty interest. 9 Although the language of the Alaska statute in Osborne provides only that a court may "hear a claim" brought under Section 12.72.010, Alaska Stat. § 12.72.020(b) (2008) (emphasis added), and Section 12.72.010 provides only that the defendant may "institute a proceeding for post-conviction relief," id. § 12.72.010 (emphasis added), the Supreme Court read this State law to confer a liberty interest in demonstrating one's innocence with new evidence.   Osborne, 557 U.S. at 68. 17 1 in some circumstances, beget yet other rights to procedures essential to the 2 realization of the parent right.'"   557 U.S. at 68 (quoting Conn. Bd. of Pardons v. 3 Dumschat, 452 U.S. 458, 463 (1981)).   4 As the Supreme Court explained, "[a] criminal defendant proved guilty 5 after a fair trial does not have the same liberty interests as a free man."   Id.   In 6 identifying any "other" procedural rights that may exist in this case, therefore, we 7 start with the principle that a defendant who has been convicted after a fair trial 8 "has only a limited interest in postconviction relief" and that the State may 9 flexibly fashion and limit procedures to offer such relief.   Id. at 69.   We have 10 explained that "the . . . deferential standard

of Medina v. California, 505 U.S. 437 11 (1992), governs the process due a prisoner seeking evidence for the purpose of 12 obtaining post-conviction relief." McKithen, 626 F.3d at 152. In keeping with 13 that standard, "which the Medina Court described as applying to 'state 14 procedural rules which . . . are part of the criminal process,'" we evaluate New 15 York's procedures for fundamental adequacy. Id. at 152-53 (quoting Medina, 16 505 U.S. at 443). Fundamental adequacy does not mean that State procedures 17 must be flawless or that every prisoner may access the DNA evidence collected in 18 his case. Nor does it mean that DNA evidence must be stored indefinitely. It 19 means only that when State law confers a liberty interest in proving a prisoner's 20 innocence with DNA evidence, there must be an adequate system in place for 21 accessing that evidence that does not "offend[] some principle of justice so rooted 22 in the traditions and conscience of our people as to be ranked as fundamental," or 18 1 "transgress[] any recognized principle of fundamental fairness in operation.'" 2 Medina, 505 U.S. at 445, 448 (quotation marks omitted). 3 Before turning to New York law (both in McKithen and in this case), we 4 consider how these principles applied to the Alaska statute in Osborne. The 5 procedures Alaska implemented to vindicate a defendant's right to 6 post-conviction relief could not plausibly be described as inadequate under the 7 Medina standard: with caveats not relevant here, Alaska law provided for 8 discovery of newly available DNA evidence in post-conviction proceedings, 557 9 U.S. at 69-70, and the Alaska courts reinforced the statutory protection with a 10 prophylactic measure that permitted defendants to access DNA evidence if they 11 could demonstrate that (1) the conviction rested primarily on eyewitness 12 identification evidence, (2) there was a demonstrable doubt concerning the 13 identification of the defendant, and (3) scientific testing was likely to resolve the 14 doubt, id. at 65 (citing Osborne v. State, 110 P.3d 986, 995 (Alaska Ct. App. 2005)). 15 Moreover, in concluding that the Alaska State "procedures [we]re adequate on 16 their face," the Supreme Court emphasized that "without trying them, Osborne 17 [could] hardly complain that they do not work in practice," id. at 71, and that 18 Osborne's decision to file a § 1983 action instead of "avail[ing] himself of all 19 possible avenues for relief in [Alaska] state court" had impaired his due process 20 claim, id. at 88 (Stevens, J., dissenting) (summarizing majority opinion). 21 Accordingly, the Court concluded that Osborne had received the process he was 19 1 due and had no free-standing federal constitutional right to the DNA evidence he 2 sought. 3 Although, as we have pointed out, the New York statute at issue in this 4 case, Section 440.30(1-a), is in several respects quite similar to the Alaska statute in 5 Osborne, what differences exist between the two statutes inure to Newton's 6 benefit. For example, Alaska's statute requires that the new evidence prove 7 actual innocence by clear and convincing evidence, while New York's Section 8 440.30(1-a) demands less of New York defendants, who must show only that the 9 evidence creates a probability of a more favorable outcome. Considering the 10 similarities and differences between the two statutes, we conclude that the liberty 11 interest created by New York law is no narrower than that created by Alaska law; 12 procedures for

vindicating this interest therefore should also be evaluated under 13 the standard described in Osborne.   14 In asking us in effect to condone its evidence management procedures in 15 this case, the City invokes our decision in McKithen, on which the District Court 16 also relied to dismiss Newton's Fourteenth Amendment claim.   McKithen had 17 been convicted by a Queens jury of a number of serious crimes.   He moved 18 pursuant to Section 440.30(1-a)(a) for DNA testing of evidence recovered at the 19 crime scene.   The State court denied his motion on the ground that "there was no 20 reasonable probability that McKithen would have received a more favorable 21 verdict had the forensic testing been performed and the results been admitted at 22 trial."   626 F.3d at 146.   McKithen then sued the Queens District Attorney in 20 1 federal court, claiming that the denial of access to evidence for post-conviction 2 DNA testing on its face violated his right to due process under the Fourteenth 3 Amendment.   Rejecting McKithen's facial due process challenge, we held that 4 New York State's procedure for post-conviction relief under Section 440.30(1-a)(a) 5 is facially adequate, see id. at 152, and that federal courts "are to defer to the 6 judgment of state legislatures concerning the process due prisoners seeking 7 evidence for their state court post-conviction actions," id. at 153.   Our decision in 8 McKithen thus represented a straightforward application of Osborne to New 9 York State law, as both Osborne and McKithen addressed direct facial challenges 10 by plaintiffs relating to the effectiveness of State (in contrast to municipal) 11 post-conviction relief procedures.   See Osborne, 557 U.S. at 71.   12 McKithen resolved an issue different from the one that this appeal compels 13 us to consider.   Unlike McKithen, Newton readily concedes that the State's 14 statutory procedures are adequate.   Instead, he contends that the City, not the 15 State, provided him with fundamentally inadequate process by undermining the 16 State's procedures by its recklessly chaotic evidence management system.   17 Having demonstrated that (in contrast to Osborne and McKithen) he diligently 18 and repeatedly tried the State's procedures for obtaining the necessary DNA 19 evidence, Newton claims that the NYPD's evidence management system was so 20 inadequate as to nullify those procedures.   This appeal and Newton's arguments 21 thus present an issue that we have yet to address relating to the interaction 22 between State law and local government in the context of post-conviction relief.   21 1 We are unaware of precedent that prevents Newton from challenging a municipal 2 custom or practice that, he contends, undermines otherwise adequate State 3 procedures.   McKithen certainly does not do so, and so the District Court erred 4 insofar as it held that McKithen squarely foreclosed Newton's claims.   Moreover, 5 by pointing out Osborne's failure to avail himself of Alaska's procedures, 6 Osborne appears to have contemplated precisely such as-applied challenges by 7 plaintiffs who attempt unsuccessfully to invoke State post-conviction relief 8 procedures.   See 557 U.S. at 71.   9 The procedures created by Section 440.30(1-a) require the State, upon a 10 defendant's motion, to "show what evidence exists and whether the evidence is available for testing."   People v. Pitts, 4 N.Y.3d 303, 311 (2005).10 11   In essence, 12 Section

440.30(1-a) creates an "essential" corollary procedural right to a faithful 13 accounting of evidence.   See Osborne, 557 U.S. at 68.   In New York, local 14 government appears to play an integral role in this process, see N.Y.C. Admin. 10 Pitts was decided in 2005 after the New York State Legislature amended Section 440.30(1-a) through the addition of subsection (b), which permitted a court to "direct the people to provide the defendant with information in the possession of the people concerning the current physical location of the specified evidence and if the specified evidence no longer exists or the physical location of the specified evidence is unknown, a representation to that effect and information and documentary evidence in the possession of the people concerning the last known physical location of such specified evidence."   N.Y. Crim. Proc. Law § 440.30(1-a)(b); see 2004 N.Y. Sess. Laws 2794 (McKinney).   However, the New York Court of Appeals concluded that the statute as originally enacted did not "place on defendants the burden to establish the location and status of the evidence they seek to be tested."   Pitts, 4 N.Y.3d at 311. 22 1 Code § 14-140(a)(1)-(2) (instructing the property clerk of the PCD to "take charge 2 of all property" seized by police and requiring that "[a]ll such property . . . be 3 described and registered by the property clerk in a record kept for that purpose"), 4 and a failure of local government in carrying out its role can nullify the adequacy 5 of State procedures and expose the municipality to constitutional liability.   6 This is hardly a new concept.   In other contexts we have permitted 7 plaintiffs to pursue claims against municipalities for deprivations of State-created 8 interests.   See, e.g., Kapps v. Wing, 404 F.3d 105, 112, 118-26 (2d Cir. 2005) (City 9 administration of State Home Energy Assistance Program was constitutionally 10 inadequate to vindicate plaintiffs' property interest in program benefits); Winston 11 v. City of New York, 759 F.2d 242, 247-49 (2d Cir. 1985) (provision of City 12 Administrative Code violated teachers' due process rights by depriving them of a 13 property interest in their contractual right to a pension, derived from the State 14 Constitution); see also Goldberg v. Kelly, 397 U.S. 254, 260-66 (1970) (City 15 procedures inadequate to vindicate rights created by State and federal programs).   16 If procedures followed by a municipality rather than a State prove to be 17 constitutionally inadequate, even in the context of facially adequate State 18 procedures, then a defendant may sue the municipality for violating his due 19 process rights on the ground that the municipality's implementation of State 20 procedures is inadequate. 21 Even in the realm of municipal (rather than State) inadequacy, however, we 22 must take care to avoid "suddenly constitutionaliz[ing]" the area of DNA testing 23 1 and thereby "plac[ing] the matter outside the arena of public debate and 2 legislative action."   Osborne, 557 U.S. at 73 (quoting Washington v. Glucksberg, 3 521 U.S. 702, 720 (1997)).   At least three factors help us avoid that pitfall here.   4 First, reinstating the § 1983 verdict against the City will not impair the 5 validity of, or expand the rights provided by, Section 440.30(1-a)(a).   As noted, 6 this case presents a challenge to the City's execution of State law, not to the law 7 itself.   See McKithen, 626 F.3d at 153 ("[T]he Osborne Court was clear that the 8 lower federal courts are to defer to the judgment of state legislatures concerning 9 the process due prisoners

seeking evidence for their state court post-conviction 10 actions." (emphasis added));
see also id. at 154 ("Barring proof of fundamental 11 inadequacy, Osborne obligates us
to defer to the New York [State] legislature's 12 judgment . . . ."). We defer to States
in this area because "it is normally within 13 the power of the State to regulate
procedures under which its laws are carried 14 out," Patterson v. New York, 432 U.S.
197, 201 (1977) (quotation marks omitted), 15 and States have "considerable expertise
in matters of criminal procedure and the 16 criminal process . . . grounded in centuries
of common law tradition," Medina, 17 505 U.S. at 445-46. 18 Second, when, as here,
a municipality promulgates policies or practices that 19 affect the criminal procedure
laws of the State, those policies or practices may fail 20 to reflect the considered
judgment of the State legislature. A local pattern, 21 custom, or practice may frustrate
or even obstruct otherwise adequate State law 22 procedures. In those instances, it
seems to us, neither Osborne nor Medina 24 1 mandates the same level of deference to
local government as they do to State 2 legislative action. 3 Third, the procedural right
at issue here is quite narrow: Newton was not 4 entitled to the preservation of evidence
under State law, but only to a faithful 5 accounting of the evidence in the City's
possession. We do not decide what 6 specific City procedure is necessary to manage
and track evidence. We simply 7 reinstate a jury verdict that found that the then-
existing system was inadequate 8 and that the City, through its agents, servants, or
employees, intentionally or 9 recklessly administered an evidence management system
that was 10 constitutionally inadequate and that prevented Newton from vindicating his
11 liberty interest in violation of his Fourteenth Amendment right to due process. 12
The addition in 2004 of New York Criminal Procedure Law Section 13 440.30(1-a)(b)
does not alter our analysis. That section provides that in 14 conjunction with a motion
to vacate under Section 440.30: 15 [T]he court may direct the people to provide the
defendant with 16 information in the possession of the people concerning the current
17 physical location of the specified evidence and if the specified 18 evidence no longer
exists or the physical location of the specified 19 evidence is unknown, a representation
to that effect and 20 information and documentary evidence in the possession of the 21
people concerning the last known physical location of such 22 specified evidence. If
there is a finding by the court that the 23 specified evidence no longer exists or the
physical location of such 24 specified evidence is unknown, such information in and of
itself 25 shall not be a factor from which any inference unfavorable to the 25 1 people
may be drawn by the court in deciding a motion under this 2 section. 3 N.Y. Crim.
Proc. Law § 440.30(1-a)(b). By envisioning that evidence might be 4 lost or
destroyed, the provision reinforces the limited nature of a convicted 5 defendant's
liberty interest in proving his innocence through DNA evidence. 6 But it does so
without eliminating the requirement that fundamentally adequate 7 procedures be in
place to allow the defendant to vindicate that interest. Again, a 8 fundamentally
adequate system for permitting defendants to access evidence 9 does not mean one in
which evidence is never lost or destroyed. Any police 10 department will occasionally
lose evidence, including useful evidence; absent 11 more, that lapse will not violate a

defendant's due process rights.    See Arizona v. 12 Youngblood, 488 U.S. 51, 58 (1988).    Rather, Section 440.30(1-a)(b) is consistent 13 with requiring the NYPD's evidence management system to provide an adequate 14 means to determine if evidence is available for testing and, if so, where the 15 evidence is located.   In addition, Section 440.30(1-a)(b)'s proscription that no 16 "inference unfavorable to the people may be drawn" from the fact that evidence is 17 missing or destroyed applies exclusively to motions to vacate.    The legislature's 18 reasonable determination that a convicted defendant should not be released 26 1 because the police have lost relevant evidence does not prevent an exonerated 2 person from having a civil remedy under § 1983 against a municipality for an 3 inadequate evidence management system. 4    3. Whether the Evidence Was Sufficient for a Reasonable Jury to 5 Find that the City Denied Newton the Process He Was Due 6 To impose liability on a municipality under § 1983, a plaintiff must 7 "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."   Bd. 8 of Cnty. Comm'rs of Bryan Cnty. Okla. v. Brown, 520 U.S. 397, 403 (1997) (citing 9 Monell v. Dep't of Soc. Servs. of the City of N.Y., 436 U.S. 658, 694 (1978)).    The 10 City acknowledges that the District Court correctly instructed the jury that in 11 order to find the City liable it was required to find that the "municipality itself 12 directly cause[d] the constitutional violation by a policy, custom or practice," that 13 is, "a persistent, widespread course of conduct by municipal officials or 14 employees that has become the usual and accepted way of carrying out policy, 15 and has acquired the force of law, even though the municipality has not 16 necessarily formally adopted or announced the custom."    Joint App'x 2672.    17 Nevertheless, the City argues that there was insufficient evidence to support the 18 jury's findings that the City's evidence management system was fundamentally 19 inadequate, and that the City officials' failures and misconduct relating to that 20 system reflected a practice or custom.    21 A careful review of the record demonstrates otherwise.    The PCD Property 22 Guide describes the NYPD's official evidence management system and also 27 1 contains the PCD's policies and procedures for storing and tracking evidence.    2 According to the Property Guide, a key tool for tracking a particular piece of 3 property was a "yellow invoice" created when the property arrived at a PCD 4 borough office.    The yellow invoice was stored in an "active yellows" file.    5 Whenever the property moved, its new location was to be printed on the yellow 6 invoice.    When the property was transported to court, the yellow invoice was to 7 be stored temporarily in an "out-to-court yellows" file, with an "out of custody" 8 card placed in its stead in the active yellows file.    When the property was 9 destroyed or auctioned, that fact and the date of destruction or sale were noted on 10 the yellow invoice and the invoice itself placed in a "closed-out yellows" box.    If 11 property was missing from its storage location, the supervisor of the PCD facility 12 was required to start a preliminary search that included (1) asking the arresting 13 officer whether the property was ever removed to court and subsequently 14 repackaged after return, and then (2) checking with Pearson Place Warehouse, a 15 warehouse facility in Queens, to determine if the missing property was located 16 there.    17 The

163

NYPD's evidence management system failed miserably in Newton's 18 case.   When Newton moved for DNA testing under Section 440.30(1-a), the 19 District Attorney's Office filed an opposition containing a statement by an NYPD 20 Sergeant that mistakenly reported that the evidence and yellow invoice had likely 21 been destroyed.   In fact, the yellow invoice for the rape kit had been in the PCD 22 "out-to-court yellows" folder since May 1988, when the evidence was first 28 1 removed to be examined.   The invoice had never been returned to the active 2 yellows file, even though the rape kit had been returned to storage at Pearson 3 Place Warehouse.   Sergeant Thomas O'Connor was involved with documenting 4 property stored in another PCD warehouse in the Bronx and ultimately assigned 5 to locate the yellow invoice for the rape kit while Newton's federal suit was 6 pending.   In one search, he found hundreds of property items and evidence with 7 no paperwork attached to them in the warehouse, as well as "[a]bout a hundred 8 or so" loose invoices that had not been marked either "destroyed" or "auctioned."   9 Joint App'x 2407-08.   Included among the loose invoices were invoices for 10 Newton's blue suede sneakers and for clothing from the victim, V.J., related to 11 Newton's case.   See Joint App'x 2408; see also Joint App'x 2767, 2773. 12 Of course, as Sergeant O'Connor's experience suggested, the problem of 13 lost invoices and evidence was by no means isolated to Newton's case: Sergeant 14 O'Connor was aware of other evidence that had been lost, Joint App'x 2401, and 15 the NYPD's failure to track evidence appears to have been pervasive.   Around 16 the time of Newton's trial, the Bronx property clerk's office had hundreds of 17 "out-to-court yellows" folders, dating back to the 1970s, that contained thousands 18 of yellow invoices; the property reflected on those invoices had never been 19 returned to the PCD or, like the rape kit in Newton's case, had been returned but 20 not properly recorded.   Joint App'x 2403.   Inspector Jack Trabitz, the PCD's 21 commanding officer at the time of the 2010 jury trial, testified that between 22 approximately 1800 and 3200 invoices went out to court from the Bronx borough 29 1 office each year from 1994 to 2006.   Joint App'x 2220.   Sergeant Bruce Kessler, 2 the commanding officer of the Bronx PCD borough office from approximately 3 1992 to 2003, could not even recall the procedure for evidence retrieval in the 4 event an item of evidence had not been returned to the borough office after a year.   Joint App'x 2359-60.11 5 6 The failures of the NYPD's evidence management and retrieval system 7 directly affected the offices of the District Attorneys, as well as certain 8 non-governmental entities.   From 2005 to 2009, requests from the District 9 Attorney's offices for post-conviction evidence frequently went unanswered 10 because logbooks contained inaccurate information and in "[n]umerous" cases 11 Although Newton refrains from advancing a failure-to-train claim on appeal, we cannot help but note that, based on the evidence, the inadequacy of the City's evidence management system appears to have been rooted in some part in the City's inadequate training of NYPD officers regarding evidence management.   According to the evidence at trial, several PCD officers, including high-ranking officials, were unfamiliar with the Property Guide and lacked training in evidence management.   And before 1995, when the Property

164

Guide was created, there was no written procedure for evidence management.   Joint App'x 2357.   As a result, both a former commanding officer who supervised the PCD starting in 1990 and one of his successors who started in 2000 received no formal training whatsoever regarding the operations of the PCD.   Joint App'x 2516-17, 2519, 2164.   Similarly, throughout the 1990s, lower-ranking officers who worked at the PCD – including the Pearson Place Warehouse – failed to receive relevant training or a written manual on property and evidence management.   Joint App'x 2461, 2464.   More disturbing still, Integrity Control Officers responsible for ensuring that employees at the PCD complied with the procedures in the Property Guide appeared to be unfamiliar with those procedures or the evidence management component of their positions.   Joint App'x 2166, 2345-47, 2364, 2598. 30 1 yellow invoices were missing.   Only about twenty percent of prosecutorial 2 requests for pre-1988 post-conviction evidence were satisfied.   Joint App'x 2401.   3 Other, equally disquieting examples of missing invoices involved the Innocence 4 Project, an organization devoted to exonerating innocent convicted defendants.   5 See Joint App'x 2601.   At the request of the Innocence Project in 2006, the PCD 6 identified and located eighty-seven invoices relevant to Innocence Project cases.   7 Nevertheless, the City acknowledged that the remaining eighty-three relevant 8 invoices "were not in the custody of the [PCD], ha[d] already been destroyed or 9 were released according to Department procedures."   Joint App'x 3444; see also 10 Joint App'x 2556, 2610.   Fifty percent of the cases that the Innocence Project 11 terminated in the City over a ten-year period were closed because the PCD had lost or destroyed DNA evidence.12 12   Joint App'x 2603. 13 Newton also adduced evidence that, prior to his release, the PCD had no 14 reliable system to determine what evidence had been destroyed and that, as a 15 result, evidence may have been improperly destroyed, or, as in Newton's case, 16 reported destroyed when it had not been.   Prior to 2000, for example, the PCD routinely disposed of rape kits,13 17 Joint App'x 2171-73, as well as so-called "white" 12 According to the testimony of an Innocence Project attorney, the national percentage of Innocence Project cases closed due to lost or destroyed DNA evidence was significantly lower than the percentage of such cases in the City.   Joint App'x 2603. 13 In 2006 the commanding officer of the PCD finally issued a written memorandum instructing that sexual assault evidence kits should never be destroyed.   Joint App'x 2172-73. 31 1 invoices, which described whether a piece of evidence had been destroyed or 2 retained by the NYPD, Joint App'x 2469.   Destroying the white invoice for 3 evidence prevented the PCD from tracking that evidence.   In 1992 and 1998, 4 moreover, the PCD engaged in what may aptly be characterized as sweeps, in 5 which it disposed of a substantial amount of arrest evidence that had not been 6 claimed.   Joint App'x 2470.   Although the evidence management system 7 improved after 2000, the PCD's commanding officer starting that year was 8 unaware that the Property Guide prohibited the destruction of arrest evidence 9 without a district attorney release, and he admitted that arrest evidence may have 10 been improperly destroyed under his command.   Joint App'x 2171.   11

Newton's expert witness, an "evidence specialist" who consulted with 12 police departments throughout the United States regarding evidence 13 management, also described the inadequacy of the NYPD's evidence 14 management system. The expert concluded that the City's evidence 15 management system, as it existed from 1994 to 2005, was "sporadic at best." 16 Joint App'x 2497. Aspects of the system, including chain-of-custody procedures 17 and practices, were "weak, if not nonexistent" and failed to meet the most widely 18 accepted professional or "industry standards" in the field of evidence management.14 19    Joint App'x 2490; see also Joint App'x 2491. 14 According to Newton's expert witness, the two most widely accepted industry standards in the field of evidence management are promulgated by the International Association of Property and Evidence, an organization that 32 1 In sum, Newton presented evidence that thousands of sometimes 2 decades-old yellow invoices at the Bronx property clerk's office – out of a total of 3 not more than 3200 such invoices per year – were in old out-to-court folders that 4 had improperly never been closed out; evidence listed as "out-to-court" for over 5 twenty years was lost; the PCD had lost track of and was unable to retrieve 6 evidence in an unreasonably large number of cases (involving evidence older 7 than five years); several high-level officials tasked with supervising the NYPD's 8 evidence management system were unfamiliar with the PCD's procedures; and 9 the PCD's dysfunction had an unconstitutionally deleterious effect on case 10 closings in a large number of cases, including, obviously, Newton's. The 11 problem in Newton's case was with the retrieval of evidence that was sitting there 12 all along. Despite the preservation of the evidence that proved crucial in 13 exonerating Newton, the PCD was unable to locate it from 1994 to 2005 and 14 inaccurately represented that it had been destroyed either in a fire or pursuant to 15 a regular disposal procedure that may not even have existed. Had Newton 16 accepted the City's recklessly erroneous representations about the evidence at 17 face value, he might have remained in prison far longer than he did. Taken 18 together, this evidence supports a finding that the City, through the poor provides educational resources and training on evidence management practices, and the Commission on Accreditation for Law Enforcement Agencies, a credentialing authority that determines whether law enforcement agencies have met industry-wide public safety standards. Joint App'x 2484-85. 33 1 administration of its evidence management system, perpetuated a practice or 2 custom that was wholly inadequate. 3 We acknowledge the City's argument that a § 1983 plaintiff seeking to hold 4 a municipality liable must "show that the municipal action was taken with the 5 requisite degree of culpability and must demonstrate a direct causal link between 6 the municipal action and the deprivation of federal rights." Brown, 520 U.S. at 7 404. There must be "proof that the municipality's decision was 8 unconstitutional" to "establish that the municipality itself [i]s liable for the 9 plaintiff's constitutional injury." Brown, 520 U.S. at 406 (emphasis added). The 10 Supreme Court has declined to consider "whether something less than intentional 11 conduct, such as recklessness or gross negligence, is enough to trigger the protections of the Due Process Clause."15

12    Daniels v. Williams, 474 U.S. 327, 334 13 n.3 (1986) (quotation marks omitted).    But in Brown it held that "a plaintiff 14 seeking to establish municipal liability on the theory that a facially lawful 15 municipal action has led an employee to violate a plaintiff's rights must 16 demonstrate that the municipal action was taken with deliberate indifference as 17 to its known or obvious consequences."    Brown, 520 U.S. at 407 (quotation marks 18 omitted).    Although we have not explicitly addressed this question in our 15 The Supreme Court has held that in a § 1983 claim against a municipality for failure to train its police force, a plaintiff is required only to show that the municipality was deliberately indifferent to the rights of those with whom the police would come into contact; however, the Court distinguished that standard from the state of mind required for an underlying claim of a constitutional violation.    City of Canton, Ohio v. Harris, 489 U.S. 378, 388 & n.8 (1989). 34 1 subsequent cases, see Barbera v. Smith, 836 F.2d 96, 99 (2d Cir. 1987), we have 2 maintained that "a state prison guard's deliberate indifference to the 3 consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983."16 4    Morales v. N.Y. State Dep't of Corr., 842 5 F.2d 27, 30 (2d Cir. 1988).    6 In keeping with Brown and Morales, we conclude that under the 7 circumstances presented here Newton at most needed to demonstrate that the City acted with recklessness or deliberate indifference17 8 toward his constitutional rights.18 9    Here, of course, the jury actually found that the City had "acted with an 16 Other courts of appeals have suggested that recklessness or deliberate indifference may suffice to establish grounds for a constitutional violation.    See, e.g., Salazar v. City of Chicago, 940 F.2d 233, 238 (7th Cir. 1991); Torres Ramirez v. Bermudez Garcia, 898 F.2d 224, 227 (1st Cir. 1990); Wood v. Ostrander, 879 F.2d 583, 587-88 (9th Cir. 1989); Comm. of U.S. Citizens Living in Nicar. v. Reagan, 859 F.2d 929, 948-50 (D.C. Cir. 1988). 17 "[T]he Courts of Appeals have routinely equated deliberate indifference with recklessness."    Farmer v. Brennan, 511 U.S. 825, 836 (1994). 18 It is not altogether clear that Newton was required to make even this showing (although, as we explain infra, he has plainly done so).    A plaintiff can identify a municipal policy by proving the existence of an unlawful practice or custom that is "so manifest as to imply the constructive acquiescence of senior policy-making officials."    Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 871 (2d Cir. 1992)).    After considering Newton's Fourteenth Amendment claim, the jury also found that the City "directly cause[d] the constitutional violation by a policy, custom or practice," because the mismanagement of evidence was "persistent" and "widespread," "ha[d] become the usual and accepted way of carrying out policy, and ha[d] acquired the force of law."    Joint App'x 2672.    Because Newton 35 1 intent to deprive . . . Newton of his constitutional rights or with a reckless 2 disregard of those rights."    Joint App'x 3502. This finding, to which we afford 3 "considerable deference," is supported by the record.    See Zeno v. Pine Plains 4 Cent. Sch. Dist., 702 F.3d 655, 671 (2d Cir. 2012).    And so a recklessness or 5 deliberate indifference analysis should have compelled the District Court to 6 uphold the 2010 jury verdict. 7    4. Arizona v. Youngblood 8 Our conclusion is consistent with Arizona v.

Youngblood, 488 U.S. 51 9 (1988).   In Youngblood, the Supreme Court held that "unless a criminal 10 defendant can show bad faith on the part of the police, failure to preserve 11 potentially useful evidence does not constitute a denial of due process of law."   12 Id. at 58.   "The presence or absence of bad faith by the police for purposes of the 13 Due Process Clause must necessarily turn on the police's knowledge of the 14 exculpatory value of the evidence at the time it was lost or destroyed," id. at 56 15 n.*, and is relevant "when we deal with the failure of the State to preserve 16 evidentiary material of which no more can be said than that it could have been proved that the City engaged directly in an unlawful custom or practice, he may not have also needed to prove that City officials acted with recklessness or deliberate indifference.   See Brown, 520 U.S. at 404 ("Where a plaintiff claims that a particular municipal action itself violates federal law, . . . resolving [the] issues of fault and causation is straightforward.").   We do not need to decide that issue here, however, because the trial evidence supports the jury's finding of reckless disregard. 36 1 subjected to tests, the results of which might have exonerated the defendant," id. 2 at 57.   3 In light of Youngblood, we must again recognize that a fundamentally 4 adequate system for permitting defendants to access evidence may be, and will 5 be, imperfect – one where evidence is sometimes lost or inadvertently destroyed.   6 Largely because this is not a "failure to preserve" case, however (the DNA 7 evidence that Newton sought was preserved, after all), our holding falls outside 8 the scope of Youngblood and reflects the limited prescription of Section 9 440.30(1-a)(b), which demands only that the NYPD's evidence management 10 system provide an adequate means to determine if evidence is available for 11 testing and, if so, where the evidence is located.   Although Youngblood makes 12 clear that Newton was not entitled to the preservation of evidence, he was 13 entitled to a faithful accounting of the evidence in the City's possession.   14 Otherwise, it seems to us, the statutory scheme developed by the State would 15 have little if any purpose.   16 Our view that Youngblood does not control the disposition of this appeal is 17 fortified when we consider the two concerns that appear to have animated 18 Youngblood's requirement that the plaintiff show bad faith on the part of the 19 police under these circumstances.   First, the requirement relieves courts from 20 undertaking "the treacherous task of divining the import of materials whose 21 contents are unknown and, very often, disputed."   Id. at 58 (quotation marks 22 omitted).   Second, the Court was "unwilling[] to read the 'fundamental fairness' 37 1 requirement of the Due Process Clause as imposing on the police an 2 undifferentiated and absolute duty to retain and to preserve all material that 3 might be of conceivable evidentiary significance in a particular prosecution."   Id. 4 (citation omitted).   "[R]equiring a defendant to show bad faith on the part of the 5 police both limits the extent of the police's obligation to preserve evidence to 6 reasonable bounds and confines it to that class of cases where the interests of 7 justice most clearly require it, i.e., those cases in which the police themselves by 8 their conduct indicate that the evidence could form a basis for exonerating the 9 defendant."   Id.   Neither concern exists in this case.19 10   As an initial matter, Newton may 11 recover under § 1983

for inadequate evidence management because the DNA 12 evidence had already exonerated him.    The District Court did not need to 13 "divine" the exculpatory import of the DNA evidence; its import was clear by the 14 time Newton started this action with the benefit of that evidence.    In addition, 15 we neither discern nor impose an "absolute" duty on the police to preserve 16 evidence based on a freestanding constitutional due process right.    To the 17 contrary, Section 440.10(1)(g) applies to newly discovered evidence, including 18 new DNA test results, and says next to nothing about a duty to maintain 19 evidence.    19 The jury did not find that the City acted in bad faith, as defined in Youngblood, and the record does not support such a finding. 38 1 In short, had the City destroyed his DNA evidence according to a 2 legitimate procedure that conformed with State law, Newton would have no 3 claim under § 1983.    Without deciding a question not before us, we do not see 4 how an incarcerated defendant (or even a person like Newton) without 5 exonerating evidence obtained by invoking State procedures would have a due 6 process claim for relief under § 1983 based on our holding today.    In contrast to 7 Youngblood, the issue here is whether a municipality may be held liable for its 8 reckless maintenance of a system that made it impossible to retrieve evidence that 9 had been preserved, that State law recognized as particularly significant, and that 10 ultimately exonerated the defendant.    11 5. Jury Instructions Regarding Newton's Due Process Claim 12 Lastly, the City also challenges the jury instructions relating to Newton's 13 due process claim.    The District Court instructed the jury that it could find that 14 the City had violated Newton's Fourteenth Amendment rights only if, among 15 other requirements, "the City engaged in a pattern, custom or practice of 16 mishandling evidence by operating a poor or a nonexistent evidence management 17 system," and this "violated [Newton's] constitutional rights by . . . denying 18 [Newton] his Fourteenth Amendment right to due process by employing an 19 inadequate evidence management system that caused City employees to 20 prematurely abandon their search for his evidence in 1994 under the mistaken 21 assumption that it had been destroyed."    Joint App'x 2673. 39 1 The challenged jury instructions were not wrong.    They correctly required 2 the jury to find that the City's evidence management system was "inadequate" as 3 a matter of due process if it prevented Newton from availing himself of the 4 procedures in Section 440.30(1-a)(a).    The jury instructions also correctly 5 premised the City's liability on the failure of its evidence management system to 6 account for the evidence, not on the destruction of evidence.    Cf. Joint App'x 7 2673. 8 B. First Amendment Court-Access Claim 9 Newton also claims that the City is liable under § 1983 for violating his First 10 Amendment right of access to the courts based on its failure to provide him with 11 evidence to challenge his conviction.    We need not address this issue at length.    12 Because the jury awarded damages on the § 1983 claim in order to 13 "compensate . . . Newton for any pain and suffering caused by the city's failure to 14 produce the rape kit for test[ing]," Joint App'x 2720, the damages award would be 15 reinstated in full even if we were to affirm the District Court with regard to either 16 Newton's Fourteenth Amendment due process claim or his First Amendment 17 access-to-the-

169

courts claim, as long as we did not affirm with regard to both.   Cf. 18 This is Me, Inc. v. Taylor, 157 F.3d 139, 146 (2d Cir. 1998) ("As long as there is 19 some evidence based upon which the jury could have held [the defendants] 20 individually liable, we must reinstate the verdict.").   21 In any event, the District Court's decision to grant the City's motion to set 22 aside the jury's verdict on this claim appears to have rested almost entirely on its 40 1 rejection of Newton's underlying Fourteenth Amendment claim that the City 2 violated his procedural right to due process.   On appeal, the City parrots the 3 District Court's rationale, arguing that Newton's access-to-courts claim fails 4 because he had no viable constitutional claim to DNA evidence in the first place.   5 Having rejected the premise of the District Court's decision and the City's 6 principal argument, we vacate the District Court's judgment dismissing Newton's 7 First Amendment claim and remand to the District Court to reconsider the claim, if necessary, in light of this opinion.20 8      9 CONCLUSION 10 We are confident that the evidence management failures identified in this 11 case have been or will soon be remedied with the help of modern technological 12 advances and stronger recordkeeping practices.   For the foregoing reasons, 13 however, we VACATE the judgment of the District Court and REMAND the case 14 with instructions to reinstate the jury verdict with respect to Newton's Fourteenth 15 Amendment claim and to reconsider Newton's First Amendment claim in light of 16 this opinion.   20 The City also argues that Newton's access-to-courts claim was inadequately pleaded and procedurally barred and that Newton forfeited his First Amendment claim because he first mentioned denial of access in his trial brief and in his opposition to the defendants' August 2010 motion to dismiss.   After reviewing the record, we conclude that both arguments are without merit.

802 N.Y.S.2d 605

Supreme Court, Bronx
County, New York.

The PEOPLE of the State of
New York

v.

Marcos POVENTUD,
Defendant.

Oct. 6, 2005.

Synopsis

Background: Defendant moved to vacate his judgment of conviction for attempted

murder in the second degree and other related crimes.

Holdings: The Supreme Court, Bronx County, Alexander W. Hunter, J., held that:

1 *Brady/Rosario* violation occurred when prosecutor failed to turn over written statement by complainant wherein he identified defendant's brother in photo array, and

2 *Brady/Rosario* violation

warranted new trial. Motion

granted.

Attorneys and Law Firms

**605 Jeremy Shockett, Assistant District Attorney, Attorney for Plaintiff.
**606 Julia Kuan, Esq., Attorney

for Defendant. Opinion

ALEXANDER W. HUNTER, J.

*338 Defendant moved to vacate his judgment of conviction for attempted murder in the second degree and other related crimes on the ground that his rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *People*

v.    *Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961) were violated and on the ground that there is newly discovered evidence.

This court decided the motion with respect to newly discovered evidence in a decision dated March 28, 2005. With respect to that branch of the motion that involved a *Brady/Rosario* violation, this court held a hearing that was conducted over several days beginning on May 12, 2005 and concluding on June 15, 2005. The parties were permitted to submit post-hearing briefs and the defendant's reply brief was received by this court on September 16, 2005. In determining that branch of the motion which involved the *Brady/Rosario* violation, this court hereby incorporates all of the documents submitted by the defendant and the People prior to the hearing

171

of this matter in addition to the evidence introduced at the hearing. At the hearing, the defendant called two witnesses: Edmund Byrnes, Esq., trial counsel for defendant Poventud and Douglas Lyons, Esq., trial counsel for co-defendant Robert Maldonado. The People called one witness, Sergeant Kenneth Umlauft.

The defendant and a co-defendant, Robert Maldonado, were convicted on April 29, 1998 of shooting Younis Duopo during a robbery of his livery cab. In May 2002, the Court of Appeals reversed the conviction of Robert Maldonado and remanded the case for a new trial. During the course of Maldonado's second trial, defendant Poventud claims that new evidence was introduced which demonstrated that the prosecution did not turn over evidence that was favorable to the defendant, thus resulting in a *Brady* violation. Specifically, on March 10, 1997, the complainant viewed a photo array presented by Sergeant Kenneth

802 N.Y.S.2d 605, 2005 N.Y. Slip Op. 25420

Umlauft, selected an identification card bearing the photograph of Francisco Poventud, the defendant's brother, initialed and dated it and -wrote on a separate piece of paper "looks a lot like him."[1]

There are several variations of the exact statement made by the complainant.

At the heart of defendant's motion is his assertion that he was not informed by the prosecution that the complainant had selected Francisco Poventud, the defendant's brother, as a person resembling one of his assailants, nor did the prosecution provide the defense with any documentation written by the *339 complainant regarding said identification procedure, thus resulting in a *Rosario* violation. The piece of paper where the complainant wrote " looks a lot like him," was never turned over and has never been located though Sgt. Umlauft testified that it was placed in the case folder.

This court credits the testimony of defense counsel Edmund Byrnes and defense counsel Douglas Lyons. Defendant's trial counsel, Edmund Byrnes, testified at the hearing that he was never informed by the District Attorney's office of the identification proceeding involving defendantPoventud's brother Francisco nor was the paper where he wrote "looks alot like him" ever turned over to him. He testified at

172

length as to how he would have used that identification procedure at the trial if he had been informed of it. The People allege that during the trial, Sgt. Umlauft had an off-**607 the-record conversation with both Mr. Byrnes and co-counsel Douglas Lyons, wherein Sgt. Umlauft informed both attorneys as to this identification procedure involving defendant Poventud's brother. Douglas Lyons, Esq., testified that he did not recall having an off-the-record conversation with Sgt. Umlauft which involved the identification procedure at issue. Both attorneys testified that there would be no strategic or tactical reason not to use that misidentification procedure at the trial when identification of the defendants played such a major role.

Sgt. Umlauft's testimony was that he conducted the identification procedure at the hospital while the complainant was "awake" and "alert" but not able to speak. In addition, Sgt. Umlauft testified that the complainant did not have his glasses on but he looked at the photo array and wrote on a pad, "looks like him." Sgt. Umlauft had the complainant sign by the photo where he wrote that statement and testified that he had a conversation with the assigned Assistant District Attorney, Greg Turkin, about the identification proceeding. He further testified that AD.A. Turkin told him to speak to the two defense attorneys at a recess during the trial about the identification proceeding and he did so in the rear of the courtroom.

1    Under *People v. Vilardi*, 76 N.Y.2d 67, 556 N.Y.S.2d 518, 555 N.E.2d 915 (1990), the standard to be used to determine whether or not a defendant is entitled to a new trial based upon the prosecution's failure to disclose exculpatory material, which has been requested, is a "reasonable possibility" that the failure to disclose the exculpatory evidence contributed to the verdict. Moreover, C.P.L. § 240.45(l)(a), states that, *340 "After the jury has been sworn and before the prosecutor's opening address ... the prosecutor shall, subject to a protective order, make available to the defendant: (a) Any written or recorded statement ... made by a person whom the prosecutor intended to call as a witness at trial, and which relates to the subject matter of the witness's testimony." The prosecutor failed to turn over the written statement by the complainant wherein he identified defendant Poventud's brother, therefore, there was a violation under *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961).

The numerous documents and transcripts submitted by the defendant in his motion

demonstrate that the jury struggled with the issue of identification. In one of the jury's notes, a copy of which was
ed to defendant's motion as Exhibit C, the jury requested to hear the testimony of the complainant regarding one of the photo arrays, they wanted to view the two photo arrays entered into evidence, they wanted to see defendant Poventud's identification cards from his wallet, and, more importantly, they wanted to hear testimony regarding "negative results." (See, Juror Note No. 3, Defendant's Exhibit C). Moreover, the jury sent a note to the court during deliberations, indicating that they were "hopelessly deadlocked." (See Juror Note # 6, Defendant's Exhibit 6).

In a case such as this one where the conviction depended on the identification by the complainant of the defendants, an identification of an individual other than the defendants on trial for the robbery is of great magnitude. The People, in their brief submitted August 26, 2005, assert that the misidentification and written statement made by the complainant is not *Brady* material and that there is no reasonable possibility that the material would have contributed to the verdict because the complainant was notwearing his glasses atthe time of the misidentification, was medicated, **608 and he was "not completely coherent." (People's Brief, p. 1-2).

2     Those factors listed by the People are for the jury to weigh and determine what significance, if any, to place upon them. The fact is that there was an identification procedure performed whereby the complainant identified an individual other than the defendants on trial as conunitting the robbery. The question of whether defendant Poventud and his brother facially look similar or not in appearance especially in light of the fact that *341 defendant's brother was incarcerated at the time of the robbery of Mr. Duopo is a crucial issue for the jury to consider. Whether or not material should be considered exculpatory and turned over to the defendant is not subject to question. This material was required by law to be turned over to the defense. What the defense and jury does with it is totally within their respective province of advancing a criminal defense and as fact finders.

Furthermore, whether or not the identification made by the complainant of the defendant's brother was a "tentative identification" as the People allege is not a factor in determining whether material is *Brady* material or not. Any identification procedure or misidentification procedure made by a complainant should be turned

174

over to a defendant who stands accused of the crime regardless of the importance that the District Attorney's office may or may not place on it. The obligation to turn over such *Brady* material rests squarely on the shoulders of the prosecutor and in this instance, the prosecutor failed in his obligation .

Moreover, glaringly absent from the hearing was testimony from the assigned Assistant District Attorney, Greg Turkin, though he was available to testify as to his version of the events. The People assert that Assistant District Attorney Greg Turkin directed the defense attorneys to speak with Sgt. Umlauft regarding the photo array in question. However, as the defendant correctly asserts, the prosecutor had an affirmative duty to inform defense counsel about the identification procedure and defense counsel should not have to go on a "fishing expedition" to obtain said material.

This court finds that the defendant met his burden by a preponderance of the evidence that *Brady/Rosario* material was not disclosed and that there is a reasonable possibility that the material in question could have affected the outcome of the trial.

Accordingly, the defendant's conviction is hereby vacated and a new trial is hereby ordered which shall be preceded by a *Wade* hearing.

This shall constitute the decision and order of this Court.

Parallel Citations

lO Misc.3d 337, 2005 N.Y. Slip Op. 25420

Exhibit B

I.    *People v. Moss*, 176 A.D.2d 826 (2d Dept. 1991): conviction reversed for police officer's loss and/or destruction of contemporaneous description of the defendant.

2.    *People v. Nikollaj*, 155 Misc.2d 642 (Sup. Ct. Bronx County 1992): New trial ordered for *Rosario* violations where police failed to turn over

numerous inconsistent statements of complainant officers. Court also criticized police for placing defendant in a lineup consisting of Bronx police officers as fillers, despite fact that complainants were also Bronx police officers.

3.   *People v. Clausell,* 182 A.D.2d 132 (2d Dept. . 1992): Police failed to disclose buy report with description of suspect that was inconsistent with officer's testimony. New trial ordered for *Brady* violation.

4.   *People v. Johnson,* 81 N.Y.2d 828 (1993): Conviction reversed where court found improper the show-up identification of defendant by robbery victim conducted hours after the crime, where both the defendant and the complainant were transported to the crime scene.

5.   *People v. Rojas,* 213 A.D.2d 56 (1st Dept. 1994): Conviction reversed where identification procedure was improper and prejudicial.

6.   *People v. Brogdon,* 213 A.D.2d 418 (2d Dept. 1995): Conviction reversed where notes made by NYPD sergeant were withheld from defendant, and where identification by undercover "cannot be said as a matter of law" to have been "merely confirmatory and not suggestive."

7.   *People v. White,* 232 A.D.2d 436 (2d Dept. 1996): Conviction reversed due to loss of police officer's memo book through lack of due care, where there was a serious identification issue, and defendant was prejudiced by his inability to cross-examine officer using missing memo

Exhibit C

1.   *People v. Cortez,* 149 Misc.2d 886 (Sup. Ct. Kings Co. 1990): Police violated "spirit" of *Brady* by intentionally destroying a tape they were ordered by the court to preserve. The court found that the D.A.'s office shared responsibility and the indictment was dismissed.

2.   *People v. Moss,* 176 A.D.2d 826 (2d Dept. 1991): Conviction reversed for police officer's loss and/or destruction of contemporaneous description of the defendant.

3.   *People v. Clausell,* 182 A.D.2d 132 (2d Dept. 1992): Police failed to disclose buy report with description of suspect that was inconsistent with

officer's testimony.  New trial  ordered for *Brady* violation.

4.   *People v. Nikollaj*, 155 Misc.2d 642 (Sup. Ct. Bronx County 1992): New trial ordered for *Rosario* violations where police failed to turn over numerous inconsistent statements of complainant officers. Court also criticized police for placing defendant in a lineup consisting of Bronx police officers as fillers, despite fact that complainants were also Bronx police officers.

5.   *People v. Dunn*, 185 A.D.2d 54 (1st Dept. 1993): Conviction reversed in part where, among other things, police detective destroyed interview notes.

6.   *People v. Morrow*, 204 A.D.2d 356 (2d Dept. 1994): Conviction reversed where a significant portion of police report was not disclosed.

7.   *People v. White*, 200 A.D.2d 351 (1st Dept. 1994): Conviction reversed where DDS containing *Brady* and *Rosario* material was not disclosed, and only was discovered through defendant's post-conviction FOIL request to the NYPD and Bronx DA's Office.

8.   *People v. Anderson*, 222 A.D.2d 442 (2d Dept. 1995): Conviction reversed where scratch notes lost or destroyed due to officer's "lack of due care."

9.   *People v. Brogdon*, 213 A.D.2d 418 (2d Dept. 1995): Conviction reversed where notes made by NYPD sergeant were withheld from defendant, and where identification by undercover "cannot be said as a matter of law" to have been "merely confirmatory and not suggestive."

10.  *People v. Joseph*, 86 N.Y.2d 565 (1995): Adverse inference instruction appropriate where police deliberately destroyed interview notes.

11.  *People v. White*, 232 A.D.2d 436 (2d Dept. 1996): Conviction reversed due to loss of police officer's memo book through lack of due care, where there was a serious identification issue, and defendant was prejudiced by his inability to cross-examine officer using missing memo book.

12.  *People v. Gallman*, 240 A.D.2d 512 (2d Dept. 1997): Conviction reversed for failure to disclose notes of police interview with a key witness; officer's typewritten notes were not duplicative equivalent because they contained

"variations" .

13. *People v. Jackson*, 237 A.D.2d 179 (1st Dept. 1997): Conviction reversed for *Brady* violation consisting of the withholding by the police of internal affairs reports that contained entries that significantly were at variance with prosecution's evidence at trial and were favorable to defendant.

14. *People v. Okafor*, N.Y.L.J. 9/8/89 at p. 21: *Rosario* and *Brady* violations found and conviction reversed where prosecutor withheld potentially exculpatory witness statements in a child sex abuse case.

15. *People v. Olmo*, 153 A.D.2d 544 (ls[1] Dept. 1989): New *Wade* hearing ordered where it was discovered that key witness gave perjured testimony and the prosecutor may have known about it.

## Exhibit D

1. *Hart v. City of New York*, 186 A.D.2d 398 (15[1] Dept. 1992): Damage award upheld against police officers who gave false grand jury and trial testimony.
2. Newton v. Destruction of exculpatory evidence 18 million

2. *Tong v. City of New York, et al.*, 95-cv-7965 [S.D.N.Y., settled 10/4/95, $35,000]: Plaintiff arrested for traffic violation, which was later dismissed. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train and supervise police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

3. *Dabbah v. City of New York, et al.*, 95-cv-2952 [S.D.N.Y., settled 3/12/96, $35,000]: Plaintiff arrested without probable cause on disorderly conduct charges; charges dismissed on People's motion 8 months after arrest.

4. *Boland v, City of New York, et al.*, 93-cv-5058 [E.D.N.Y., settled 8/6/96, $30,000]: Plaintiff arrested without probable cause; held in custody for two nights.

5. *Kadlub v. City of New York, et al.*, 95-cv-1080 [E.D.N.Y., settled 12/11/96, $34,000]: Plaintiff arrested without probable cause on drug possession and sale charges. Complaint alleged *Monell* theory of liability based on the City's

deliberate indifference to constitutional obligations of the NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

6.  *Castro v. City of New York, et al.,* 94-cv-5114 [S.D.N.Y., settled 3/18/97, $72,500]: Plaintiff arrested on weapons possession charges without probable cause; charges dropped after plaintiff was held in custody for several hours. Complaint alleged that NYPD officer responded to plaintiff s complaints about wrongful arrest by saying that he would not release her, but if the arrest were in error she could "always sue the City, [because] they got a lot of money."

7.  *McCaskill v. City of New York, et al.,* 96-cv-3687 [E.D.N.Y., settled 7/10/97, $100,000]: Plaintiff arrested for disorderly conduct without probable cause; charges pending for approximately 6 months before dismissal by the court.

8.  *Gurley v. City of New York, et al.,* 95-cv-2422 [E.D.N.Y., settled 8/21/97, $1,7500,000]: Conviction obtained in 1972 was vacated over 20 years later based on prosecutor's withholding of exculpatory evidence, including an NYPD ballistics report. Complaint alleged that NYPD had longstanding policy of deliberate indifference to the constitutional requirement that exculpatory evidence be preserved and disclosed to defendants.

9.  *Gaylock v. City of New York, et al.,* 96-cv-6183 [E.D.N.Y., settled 3/6/98, $90,000]: Plaintiffs arrested without probable cause on weapons charges, which were pending for

10 months before dismissal by court. Complaint alleged *MonellAskins* theory of liability based on the City's failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

10.  *Gordon* v. *City of New York, et al.,* 97-cv-8035 [S.D.N.Y., settled 11/12/98, $40,000]: Plaintiff arrested without probable cause based on false allegations in felony complaint made by NYPD officers; charges dismissed by prosecutor 3 months after arrest.

11.  *Perez* v. *City of New York, et al.,* 98-cv-2331 [S.D.NY., settled 1/16/99, $15,000]: Plaintiff arrested without probable cause; charges dismissed by court approximately 6 months after arrest.

12. *Ziehenni* v. *City of New York, et al.*, 98-cv-3763 [S.D.N.Y., settled 3/5/99, $55,000]: Plaintiff arrested without probable cause; charges pending for 2 Yi months before they were dismissed by the court. Complaint alleged arrest was made in retaliation for plaintiff s prior CCRB complaint.

13. *Deluise* v. *City of New York, et al.*, 98-cv-2551 [S.D.N.Y., settled 3/18/99, $28,500]: Plaintiff arrested without probable cause.

14. *Napoli* v. *City of New York, et al.*, 97-cv-1255 [E.D.N.Y., settled 4/9/99, $60,000]: Plaintiff arrested on weapons possession and assault charges based on false testimony by NYPD officers in grand jury. Plaintiff acquitted approximately one year after arrest. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train and supervise police officers, and negligent hiring of officers, which caused violations of plaintiff s constitutional rights.

15. *Jefferson* v. *City of New York, et al.*, 98-cv-1097 [E.D.N.Y., settled 4/14/99, $175,000]: Plaintiff corrections officer arrested on drug charges without probable cause; charges pending for 5 months before grand jury returned no true bill. Complaint alleged that NYPD officers failed to inform prosecutors of their knowledge of plaintiff's innocence during the prosecution.

16. *Denizard* v. *City of New York, et al.*, 98-cv-423 [E.D.N.Y., settled 6/4/99, $64,000]: Plaintiff arrested without probable cause for disorderly conduct, resisting arrest. Charges dismissed on People's motion eight months after arrest.

17. *Sweazie* v. *City of New York, et al.*, 99-cv-419 [E.D.N.Y., settled 10/20/99, $20,000]: Plaintiff arrested on weapons possession charges; prosecution continued based on NYPD officers' false statements in felony complaint. Charges dismissed when grand jury voted no true bill. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights; also alleged NYPD's institutional failure to follow up on civilian complaints made to JAB and CCRB

18. *Daniels v. City of New York, et al.*, 00-cv-1981 (S.D.N.Y., settled 3/15/00, $28,500): Plaintiff arrested without probable cause on weapons charges; charges dismissed by the court 8 months after arrest.

19. *Almonte v. City of New York, et al.*, 99-cv-519 [E.D.N.Y., settled 7/12/00, $30,000]: Plaintiff arrested on drug sale charges without probable cause; indictment dismissed by the court 1 year, 9 months after arrest. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional rights, failure to train police officers, and negligent hiring of officers, which caused plaintiff's malicious prosecution and unlawful arrest.

20. *Fields v. City of New York, et al.*, 99-cv-8130 [E.D.N.Y., settled 7/28/00, $15,000]: Plaintiff arrested without probable cause; prosecution continued for four months before dismissal by court. Complaint alleged *Monell* theory of liability based on the City's failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

21. *Younger v. City of New York, et al.*, OO-cv-836 [S.D.N.Y., settled 9/1/00, $25,000]: Plaintiff arrested without probable cause; complaint alleged that arrest was made in retaliation for plaintiff's complaint to JAB.

22. *Lovell v. City of New York, et al.*, 00-cv-0002 [S.D.N.Y., settled 10/20/00, $40,000]: Plaintiff arrested without probable cause for turnstile jumping based on false statements made by NYPD officer in criminal complaint. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights; also alleged NYPD's institutional failure to follow up on civilian complaints made to JAB and CCRB.

23. *Cotto v. City of New York, et al.*, 00-cv-1341 [E.D.N.Y., settled 12/01/00, $30,000]: Plaintiff arrested without probable cause; charges pending for one month before dismissal by the court.

24. *Coleman v. City of New York, et al.*, OO-cv-2019 [E.D.N.Y., settled 1/2/01, $60,000]: Two plaintiffs arrested without probable cause.

25. *Crespo v. City of New York, et al.*, 93-cv-8847 [S.D.N.Y., settled 8/29/06, $25,000]: Plaintiff arrested without probable cause on weapons possession

charges. Complaint alleged *Monell* claim based on the NYPD's "foster[ing of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals."

<u>Exhibit E</u>

1. *People v. Castro,* 147 A.D.2d 410 (1st Dept. 1989): Hearing on § 440.10 motion ordered where co-defendant, unbeknownst to defendant at trial, provided information to prosecution.

2. *People v. Okafor,* N.Y.L.J. 9/8/89 at p. 21: *Rosario* and *Brady* violations found and conviction reversed where prosecutor withheld potentially exculpatory witness statements in a child sex abuse case.

3. *People v. Olmo,* 153 A.D.2d 544 (ls[1] Dept. 1989): New *Wade* hearing ordered where it was discovered that key witness gave perjured testimony and the prosecutor may have known about it.

4. *People v. Roman,* 150 A.D.2d 252 (1st Dept. 1989): Conviction reversed where prosecutor's improprieties on summation included, among other things, his attempt to give legal instruction to the jury, and his improper vouching for his own witnesses.

5. *People v. Negron,* 161 A.D.2d 537 (l5[1] Dept. 1990): Conviction reversed where, among other things, prosecutor delivered a misleading summation accusing defendant and his counsel of fabricating theory of defense.

6. *People v. World,* 157 A.D.2d 567 (1st Dept. 1990): Conviction reversed where prosecutor denigrated defense theory of self defense, accused defendant of lying and tailoring his testimony to appear less culpable, suggested that defendant was not entitled to fair trial, and improperly vouched for credibility of eyewitness.

7. *People v. Jorge,* 171 A.D.2d 498 (l5[1] Dept. 1991): Conviction reversed for improper summation based on prosecutor's inflammatory comments.

8. *People v. McReynolds,* 175 A.D.2d 31 (1st Dept. 1991): Conviction reversed based for prosecutor's improper impugning of defense counsel's integrity.

9.    *People v. Butler,* 185 A.D.2d 141 (1st Dept. 1992): Conviction reversed where prosecutor's summation was found to violate the Code of Professional Responsibility.

10.   *People v. Hernandez,* 185 A.D.2d 147 (l5t Dept. 1992): Conviction affirmed, but prosecutor admonished regarding his summation and directed to receive training in order to refrain from future improper conduct.

11.   *People v. Lewis,* 174 A.D.2d 294 (1st Dept. 1992): Conviction reversed where prosecutor failed to disclose deal made with different prosecutor in another city; misled the jury that no promises were made.

12.   *People v. Mudd,* 184 A.D.2d 388 (ls[1] Dept. 1992): Conviction reversed for numerous reasons, including the prosecutor's summation which was "directly contrary to the evidence."

13.   *People v. Shears,* 184 A.D.2d 357 (1st Dept. 1992): Conviction affirmed where prosecutor improperly characterized defendant as a "magician," and improperly impugned defense witness's motives.

14.   *People v. Banfield,* 194 A.D.2d 330 (1[51] Dept. 1993), and *People v. Byfield,* 194 A.D.2d 331 (1st Dept. 1993): Convictions reversed where prosecutor promised witness "favorable disposition" of witness's case, but did not disclose that to defendants.

15.   *People v. Slaughter,* 189 A.D.2d 157 (1st Dept. 1993): Conviction reversed where, among other things, prosecutor improperly vouched for witnesses during summation.

16.   *People v. White,* 200 A.D.2d 351 (1st Dept. 1994): Conviction reversed where DDS of eyewitness contradicting witness's trial testimony was withheld by prosecutor. The Court found that the People violated both *Brady* and *Rosario.*

17.   *People v. Ramos,* 201 A.D.2d 78 (15[1] Dept. 1994): Conviction reversed for prosecution's failure to turn over *Brady* material related to credibility of

complaining witness in child abuse case.

18.    *People v. Rutter*, 202 A.D.2d 123 (1st Dept. 1994), and *People v. Bowen*, 234 A.D.2d 161 (15[1] Dept. 1996): Convictions reversed because, among other things, the prosecutor failed to disclose a transcript of a polygraph exam performed on the People's main witness containing both exculpatory and impeachment material.

19.    *People v. Johnson*, 212 A.D.2d 362 (1st Dept. 1995): Conviction affirmed, but court found summation "improper," as the prosecutor's comments were "misleading."

20.    *People v. Williams*, 212 A.D.2d 388 (Pt Dept. 1995): Conviction reversed where prosecutor repeatedly ignored trial judge's rulings as to scope of questioning and argued on summation that defendant was guilty of other uncharged crimes.

21.    *People v. Lantigua*, 228 A.D.2d 213 (1st Dept. 1996): Conviction reversed where prosecutor failed to disclose that eyewitness was with another person when she allegedly saw the crime.

22.    *People v. Collins*, 173 Misc.2d 350 (Sup. Ct. Bronx Co. 1997): Conviction set aside for prosecutor's failure to disclose complainant's history of mental illness and substance

23.    *People v. King*, 241 A.D.2d 329 (1st Dept. 1997): Conviction reversed where prosecutor delayed turning over *Rosario* material.

24.    *People v. Mikel*, 710 N.Y.S.2d 70 (1st Dept. 1997): Conviction reversed where prosecutor failed to disclose that witness violated his cooperation agreement prior to trial by fleeing to Puerto Rico, and when he was returned, entered into a new cooperation agreement to cover the numerous felony charges stemming from his flight.

25.    *People v. Ortega*, 241 A.D.2d 369 (1st Dept. 1997): Conviction reversed where, among other things, prosecutor failed to disclose the transcript of eyewitness's Grand Jury rebuttal testimony until its existence was discovered mid-trial.

26.   *People v. Olivero*, 272 A.D.2d 174 (1st Dept. 2000): Conviction reversed
      where, among other things, prosecutor "mischaracterized" evidence on
      summation.

27.   *Morales v. Portuondo*, 165 F. Supp.2d 601 (S.D.N.Y. 2001):
      Convictions of two defendants unconditionally discharged based on
      prosecutor's failure to disclose key exculpatory evidence pointing to
      another perpetrator.

28.   *Mendez v. Artuz*, 303 F.3d 411 (2d Cir. 2002): Suppression of favorable,
      material evidence, that third party in custody in another jurisdiction had
      confessed to hiring hit man to kill shooting victim, was a *Brady* violation
      that required relief.

29.   *Flores v. Demskie*, 215 F.3d 293 (2d Cir. 2002): On the last day of trial
      prosecution disclosed that an additional memo book from one of the
      police witnesses had not been turned over and was lost.

30.   *People v. Johnson*, 191 Misc.2d 105 (Sup. Ct. Bronx Co. 2002): Conviction
      set aside for
      *Brady* and *Rosario* violations.

31.   *People v. Bruno*, Ind. No. 0027/97, N.Y.L.J., 4/23/03 at p. 19: Conviction
      reversed where prosecutor withheld information casting doubt on the
      voluntariness of a confession.

32.   *People v. LaPorte*, 306 A.D.2d 93 (1st Dept. 2003) Conviction reversed
      where prosecutor impugned defense counsel's integrity and ridiculed the
      defense.

33.   *People v. Spruill*, 5 A.D.3d 318 (l5t Dept. 2004): Conviction reversed where
      prosecutor's summation comments improperly inflamed jury's emotions.

34.   *People v. Woods*, 9 A.D.2d 293 (1st Dept. 2004): Conviction reversed for
      *Crawford* errors at trial and also because prosecutor met with key witness
      alone in her office, and that witness could have viewed confidential records
      related to the trial.

35.   *People v. Aquilar*, 14 Misc.3d 1 (Sup. Ct. Bronx Co. 2006): Conviction
      reversed where prosecutor's comments on summation "exceeded the bounds

of legitimate advocacy."

Lack of Jurisdiction, Material false statements used in Grand Jury Survive guilty plea

36.    Courts have dismissed in these circumstances even though there was sufficient other reliable evidence presented, or the prosecutor acquired the knowledge of the false evidence after the indictment was handed up, or the prosecutor made a full disclosure of the falsity after discovering it (United States v Basurto, supra; cf. People v Leary, 305 N.Y. 793). Indeed, courts have stated that indictments may be dismissed solely because they were obtained by the prosecutor for improper motives (see, e.g., United States v DeMarco, 401 F.Supp. 505, affd 550 F.2d 1224; People v Tyler, 46 N.Y.2d 251; Matter of Cunningham v Nadjari, 39 N.Y.2d 314, 318).PEOPLE v. PELCHAT, 62 N.Y.2d 97 (1984)

37.  By pleading, defendant has elected a trial strategy. He has determined, for whatever reason, that he will not litigate the question of guilt. Having made that bargain he necessarily surrenders certain rights including the right to challenge the factual basis for the plea (see People v Foster, 19 N.Y.2d 150, 151; People v Griffin, 7 N.Y.2d 511, 515). He does not, however, forfeit all right to challenge the court's jurisdiction (People v Harper, 37 N.Y.2d 96; People v Koffroth, 2 N.Y.2d 807; People v Miles, 289 N.Y. 360) or raise arguments of a constitutional dimension (see People v Lee, 58 N.Y.2d 491 [constitutionality of statute]; People v Blakley, 34 N.Y.2d 311 [speedy trial rulings]; People v Francabandera, 33 N.Y.2d 429 [defendant's competence to stand trial]; People v Lynn, 28 N.Y.2d 196, supra [right to be informed of right to appeal]; see, also, Pitler, NY Crim Prac Under the CPL, § 9.11, pp 453-454; cf. Boykin v Alabama, 395 U.S. 238). Falling into the same category is a challenge based upon a guilty plea to an accusatory instrument which is void because of the prosecutor's knowledge that the only evidence to support it is false (see People v Peetz, 7 N.Y.2d 147; People v Koffroth, supra; People v Sexton, 187 N.Y. 495, 511, supra).PEOPLE v. PELCHAT, 62 N.Y.2d 97 (1984)

38.  When a conviction is obtained by the presentation of testimony known to the prosecuting authorities to have been perjured, due process is violated. The clause "cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance . . . is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.  Mooney v. Holahan, 294 U.S. 103, 112

39. Alcorta v. Texas (U.S. 1957): Due process violated by prosecution's "passive" use of perjured testimony.

40. Napue v. Illinois (U.S. 1959): Held that "the failure of the prosecutor to correct the testimony of the witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment."

41. Banks v. Dretke (U.S. 2004): Misconduct in capital murder case because prosecution withheld information that would have discredited two prosecution witnesses, including one who was a paid I police informant and the other had coached by prosecution before testifying.

42. The Court has long held it would set aside under the due process clause convictions that are supported by no evidence at all,Thompson v. City of Louisville, 362 U.S. 199 (1960); Garner v. Louisiana, 368 U.S. 157 (1961); Taylor v. Louisiana, 370 U.S. 154 (1962); Barr v. City of Columbia, 378 U.S. 146 (1964); Johnson v. Florida, 391 U.S. 596 (1968). See also Chessman v. Teets, 354 U.S. 156 (1957).

<u>Cannot use uncorroborated testimony to corroborate another uncorroborated testimony to find</u>

Probable Cause.

43. Cannot use unverified testimony of an Accuser to verify the unverified testimony of another Accuser for finding Probable Cause that a crime was committed. Wong Su v. United States, 371 US 471

44. if the information imparted "constitutes [no] more than unsubstantiated rumor, unfounded accusation or conclusory characterization," it will not meet the Aguilar-Spinelli test even if supplied by a reliable informant (People v Ketcham, 93 NY2d at 420).[FN2] Moreover, while the "fellow officer rule" permits an arresting officer to act at the direction of another officer "provided that the police as a whole were in possession of information sufficient to constitute probable cause to make the arrest" (People v Ramirez-Portoreal, 88 NY2d 99, 113 [1996] [internal quotation marks and citation omitted]), probable cause is not established by "unsubstantiated hearsay communication—even when transmitted by a fellow officer" (People v Ketcham, 93 NY2d at 420).

45. "Probable cause is established absent materially impeaching circumstances, where, as here, the victim of an offense communicates to the arresting officer information affording a credible ground for believing the offense was committed and

187

identifies the accused as the perpetrator" (People v Gonzalez, 138 A.D.2d 622, 623 [2d Dept 1988] [emphasis added], lv denied 71 N.Y.2d 1027 [1988]). The question is whether the police are aware of "materially impeaching circumstances" or grounds for questioning the complainant's credibility.

## Must be arrested and refingerprinted if Indicted in Secret

46. CPL 210.10 (3) If the defendant has not previously been held by a local criminal court for the action of the grand jury and the filing of the indictment constituted the commencement of the criminal action, the superior court must order the indictment to be filed as a sealed instrument until the defendant is produced or appears for arraignment, and **must issue a superior court warrant of arrest**. Upon the request of the district attorney, in lieu of a superior court warrant of arrest, the court may issue a summons if it is satisfied that the defendant will respond thereto. Upon the request of the district attorney, in lieu of a warrant of arrest or summons, the court may instead authorize the district attorney to direct the defendant to appear for arraignment on a designated date if it is satisfied that the defendant will so appear. A superior court warrant of arrest is executable anywhere in the state. Such warrant may be addressed to any police officer whose geographical area of employment embraces either the place where the offense charged was allegedly committed or the locality of the court by which the warrant is issued. **It must be executed in the same manner as an ordinary warrant of arrest, as provided in section 120.80, and following the arrest the executing police officer must without unnecessary delay perform all recording, fingerprinting, photographing and other preliminary police duties required in the particular case, and bring the defendant before the superior court.** If such superior court is not available, the executing police officer may bring the defendant to the local correctional facility of the county in which such superior court sits, to be detained there until not later than the commencement of the next session of such court occurring on the next business day

## Additional Brady Law

47. Brady does not require actual innocence, and even "'[a] guilty man is entitled to a fair trial.'"People v. Buchalter, 289 N.Y. 181, 225 (1942) (Lehman, Chief Judge, concurring)

48. "While Brady ensures a fair trial, a defendant's right to pre-trial disclosure under Brady is not conditioned on his ability to demonstrate that he would or even probably would prevail at trial if the evidence were disclosed," much less that he is in fact innocent. Osborne v. Dist. Att'y's Office for Third Jud. Dist., 521 F.3d 1118, 1132 (9th Cir. 2008), rev'd on other grounds, 557 U.S. 52 (2009). The remedy for a Brady claim is therefore a new trial, as proof of the constitutional violation need not be at

188

odds with his guilt. See, e.g., United States v. Sipe, 388 F.3d 471, 493 (5th Cir. 2004).

49. The Court has long held it would set aside under the due process clause convictions that are supported by no evidence at all, Thompson v. City of Louisville, 362 U.S. 199 (1960); Garner v. Louisiana, 368 U.S. 157 (1961); Taylor v. Louisiana, 370 U.S. 154 (1962); Barr v. City of Columbia, 378 U.S. 146 (1964); Johnson v. Florida, 391 U.S. 596 (1968). See also Chessman v. Teets, 354 U.S. 156 (1957).

50. A prosecutor also does not have absolute immunity "for acts that are manifestly or palpably beyond his authority" or are "performed in the clear absence of all jurisdiction." Schloss v. Bouse, 876 F.2d 287, 291 (2d Cir. 1989)

When State Court makes determination of Post Conviction 440 without a hearing is a

## UNREASONABLE DETERMINATION

51. Liebman, Federal Habeas Corpus Practice and Procedure §20.2(b) at 907-08 n. 22 (51ed.2005)). "Under those circumstances," Judge Korman reasoned, it is proper to apply the pre- AEDPA rule that, "'[w]here a habeas petitioner alleges facts that, if proven, would entitle him to relief, a federal court must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in the state court.'" Bell v. Ercole, supra) (emphasis added) (quoting Amiel v. United States, 209 F.3d 195, 199-200 (2d Cir. 2000) (internal citation omitted)). Accord, Walker v. True, 399 F.3d 315, 327 (41 Cir. 2005).Case 1:08-cv-01359-DLI Document 11 Filed 09/11/08 Page 11of 19 PageID #: 665 All of the other cases we cited in our previous memorandum at page 6, including the Second Circuit's decision in Drake v. Portuondo, 321 F.3d 338, 345 (2d Cir. 2003), reach the same conclusion: there can be no deference to a state court's application of law to "facts" where it "did not permit the development of the factual record." Id. See Taylor v. Maddox, 366 F.3d 992, 1001 (91 Cir. 2004) ("If ... a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts" [emphasis added].).

52. We have held that, "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." Milke, et al v. Ryan, No. 07-99001 (9th Cir. 2013)

<u>Municipality 50-H Hearing Law</u>

The municipality or municipal agency has 90 days from receiving the Notice of Claim to conduct a 50-h hearing. **If the Municipal Agency demands a Statutory Hearing, you must appear. You cannot begin a lawsuit until after appearing at the Statutory Hearing.** If the municipality or agency does not demand a hearing within 30 days of filing the Notice of Claim, you have the right to commence the lawsuit immediately although you may have to appear for the hearing after filing suit.

## POLICE GO AGAINST THE NEEDS OF THE DA ARE HARRASSED

### *NYPD Quota Whistle-Blower's Lawsuit Revived*

MANHATTAN (CN) - New York City police officers have free speech rights too, just as long as they talk though civilian channels, the 2nd Circuit ruled Thursday.

The potentially groundbreaking decision allows NYPD Officer Craig Matthews to sue the department for allegedly retaliating against him after he blew the whistle on police quotas in the Bronx, implemented in 2008.

Attorneys for Matthews say the decision could also unmuzzle public employees of all stripes.

Matthews, a 17-year police veteran of the 42nd Precinct, said that he started reporting issues with the policy to his then-commander, Capt. Timothy Brugge, in early 2009.

Two years later, Matthews said that trouble started after he told Brugge's successor, Capt. Jon Bloch, that the quota policy caused "unjustified stops, arrests, and summonses because police officers felt forced to abandon their discretion in order to meet their numbers."

He added that this "was having an adverse effect on the precinct's relationship with the community," according to his complaint.

The brass allegedly responded by subjecting Matthews to punitive assignments, poor evaluations, separation from his longtime partner, denials of overtime and leave, and constant harassment and threats.

His supervisor, Lt. Mark Sedran, allegedly told him during a roll call: "If you come after me, I will come back after you harder."

Matthews <u>sued</u> New York City, ex-Commissioner Ray Kelly, Bloch and Sedran in 2012.

His lawsuit stumbled as two federal judges separately found themselves unable to overcome the Supreme Court's controversial <u>decision in</u> *Garcetti v. Ceballos.*

The *Garcetti* majority created a rule finding that government employees have no protections for speech that is "pursuant to" their jobs. It rejected a claim that the Los

190

Angeles district attorney denied a promotion to an employee who criticized a bad warrant.

On Thursday, a 2nd Circuit panel unanimously found that *Garcetti* was no bar for Matthews, who "did not follow internal grievance procedures."

"Matthews chose a path that was available to ordinary citizens who are regularly provided the opportunity to raise issues with the precinct commanders," Judge John Walker wrote for the court. "Captain Bloch stated that he attended nearly every monthly community council meeting. And Captain Bugge testified that one to three times per month he met with members of the community to discuss issues in the precinct. Matthews reported his concerns about the arrest quota system to the same officers who regularly heard civilian complaints about precinct policing issues."

U.S. District Judge J. Garvin Murtha, sitting by designation from Vermont, rounded out the panel with the 2nd Circuit's Judge Peter Hall.

The New York Civil Liberties Union, which represents Matthews, hailed the ruling as a "victory for the free speech rights of police officers and all public employees."

"Quotas lead to illegal arrests, criminal summonses and ruined lives. They undermine the trust between the police and the people they are supposed to be protecting and serving," the NYCLU's associate legal director Christopher Dunn said in a statement. "Today's decision protects the ability of police officers to speak out against this kind of misconduct when they see it. New York City's finest should be applauded when they expose abuse, not abused and retaliated against."

The New York City Law Department said it was reviewing the decision.

191